**In re MCA, INC. Shareholders Litigation.**

**Civil Action No. 11740.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 8, 2000.

Decided: Aug. 4, 2000.

**30.** Letter Op. at 3.

Joseph A. Rosenthal, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, of counsel, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, LLP, New York City, Abbey, Gardy & Squitieri, LLP, New York City, Wolf Popper, LLP, New York City, Berger & Montague, Philadelphia, Pennsylvania, for plaintiffs.

R. Franklin Balotti, Anne Foster, Michael J. Merchant, Richards, Layton & Finger, Wilmington, Delaware, of counsel, Barry R. Ostrager, Mary Kay Vyskocil, Paul C. Curnin, Joseph M. McLaughlin, Simpson Thacher & Bartlett, New York City, for defendants Matsushita Electric Industrial Company, Ltd. and Matsushita Holding Corporation.

Joel Friedlander, Bouchard Margules Friedlander & Maloneyhuss, Wilmington, Delaware, of counsel, Stuart L. Shapiro, Shapiro Forman & Allen, LLP, New York City, Roger W. Kirby, Peter S. Linden, Kirby McInerney & Squire, LLP, New York City, Henry P. Monaghan, New York City, for intervenors Lawrence Epstein and John Linder.

Martin P. Tully, Bradley J. Enna, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, of counsel, Theodore N. Mirvis, Jeffrey R. Boffa, Alexander Shaknes, Wachtell, Lipton, Rosen & Katz, New York City, for the Former MCA Director-defendants.

## OPINION

CHANDLER, Chancellor.

Petitioners Lawrence Epstein and John Linder seek to intervene in this consolidated class action under Court of Chancery Rule 24 in order to vacate a settlement order and final judgment pursuant to Rule 60(b) that this Court entered on February 22, 1993. For reasons I set forth more fully below, I conclude that plaintiffs have failed to meet the Rule 24 standard to intervene. Furthermore, even if permitted to intervene, petitioners are not entitled to relief from judgment. Before I explain the reasons for these conclusions, it is necessary to describe briefly the history of this controversy. The following sum-

mary borrows heavily from the parties' and other courts' descriptions.

## I. BACKGROUND FACTS

In 1990, Matsushita Electric Industrial Company made a tender offer for, and eventually acquired, MCA, Inc., a Delaware corporation. The transaction resulted in two parallel class actions. First, MCA shareholders filed a purported class action in the Delaware Court of Chancery. Shortly thereafter, MCA shareholders commenced a second purported class action in the United States District Court for the Central District of California.

The Delaware class action was filed on September 26, 1990—exactly one day after Matsushita and MCA publicly announced that they were negotiating a possible deal. The Delaware action alleged that MCA's directors had breached their fiduciary duties to MCA shareholders by failing to obtain the best price in the acquisition of MCA.

On November 26, 1990, Matsushita announced its tender offer for MCA. It offered holders of MCA common stock $71 per share if they tendered their shares before December 29, 1990—about a 100 percent premium over the market price. More than 90 percent of all MCA stockholders tendered their shares and, on January 3, 1991, Matsushita acquired MCA for $6.1 billion.

On December 3, 1990, a few days after the required SEC filings disclosed the terms of the tender offer, several MCA shareholders filed suit in the United States District Court for the Central District of California. Based solely on federal law, their complaints alleged that the tender offer violated SEC Rules 14d-10[1] and 10b-13[2] by offering preferential treatment in the tender offer to MCA principals Lew Wasserman and Sidney Sheinberg, who allegedly were to receive a better price. The Delaware plaintiffs did not raise the violations of Rule 14d-10 in their complaint and, indeed, could not have done so since claims under the Securities Exchange Act of 1934 are subject to the exclusive jurisdiction of federal courts.

About one week after the federal claims were filed in California, the parties in the Delaware action announced a settlement in principle that released all state as well as all federal claims arising from the acquisition of MCA. The proposed non-opt out Delaware settlement provided for the release of all shareholder claims arising out of the acquisition in exchange for the payment of attorneys fees and the modification of a poison pill in the charter of the MCA subsidiary spun off to the shareholders. A notice sent to all MCA shareholders described the disposition of both the state and federal litigation, explaining that the settlement would release all claims arising out of the acquisition, including those in the federal litigation, and advised shareholders of their right to object to the settlement.

After notice and a hearing in which objectors challenged the settlement, then-Vice Chancellor Hartnett rejected the proposed Delaware settlement.[3] He viewed the state law claims as "at best, extremely weak," and noted that the value of the settlement consideration was minimal.[4] Vice Chancellor Hartnett did add, however, that the federal claims might have some merit. Accordingly, he found it

---

1. 17 CFR § 240.14d-10.

2. 17 CFR § 240.10b-13.

3. See *In re MCA, Inc. Shareholders Litig.*, Del. Ch., 598 A.2d 687, 691, 695 (1991).

4. *Id.* at 690, 694.

would be unfair to compel the release of the federal claims by approving a settlement without an opt-out provision.[5]

In February of 1992, the California federal district court awarded Matsushita summary judgment on all counts of the federal complaint. The federal plaintiffs, who included Epstein and Linder, appealed to the United States Court of Appeals for the Ninth Circuit.

Meanwhile, after the district court's dismissal of the federal action and during the appeal to the Ninth Circuit, the parties to the Delaware action renegotiated the settlement—this time affording plaintiffs the ability to opt out of the class—which this Court eventually approved. Eighteen members of the class requested exclusion from the Delaware settlement. The federal Epstein plaintiffs did not ask to be excluded from the class. Moreover, the Epstein plaintiffs did not object to or otherwise challenge the Delaware settlement, despite their professed belief that Delaware counsel failed to adequately represent the interests of the class.

Vice Chancellor Hartnett, recognizing that a Ninth Circuit reversal remained a possibility, nonetheless relied on the district court dismissal as evidence that the federal claims possessed "minimal" value.[6] The Ninth Circuit had refused to expedite the federal appeal, and Vice Chancellor Hartnett evidently believed that the Ninth Circuit might not rule on the appeal for years. Importantly, and unlike the first proposed settlement, the reconfigured Delaware settlement included: (1) an opt-out provision protecting class members who preferred the prospects of the federal litigation, and (2) a $2 million fund that afforded MCA's shareholders two to three cents per share in exchange for release of all federal and state claims.[7] Vice Chancellor Hartnett approved the reconfigured settlement (after reducing the requested attorneys fees) and its settlement proceeds were paid out in 1994. The Epstein plaintiffs, who had not opted-out or objected, received their share of the settlement proceeds.

In the course of the Ninth Circuit case, Matsushita invoked the Delaware judgment, which released all state and federal claims as a bar to the continued prosecution of the federal claims by any shareholder who failed to opt-out of the Delaware settlement. The Epstein plaintiffs, however, insisted that state courts lacked authority to approve a release of exclusive federal claims. The Ninth Circuit agreed with this position, holding that the Delaware judgment was not entitled to full faith and credit.[8] Defendants appealed to the United States Supreme Court.

The United States Supreme Court accepted *certiorari* on the following question: may a federal court withhold full faith and credit from a state court judgment approving a class action settlement simply because the settlement releases claims within the exclusive jurisdiction of the federal courts.[9] The United States Supreme Court held that in the absence of a limitation on the full faith and credit clause, federal courts should look to the law of the state because "a Delaware court would

---

**5.** *Id.* at 696.

**6.** *In re MCA, Inc. Shareholders Litig.*, C.A. No. 11740, 1993 WL 43024, at *4, V.C. Hartnett (Feb. 16, 1993).

**7.** *Id.*

**8.** See *Epstein v. MCA, Inc.*, 50 F.3d 644 (9th Cir.1995), *rev'd, Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996).

**9.** See *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 369, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996)

afford preclusive effect to the settlement judgment in this case."[10] The United States Supreme Court further noted that the Delaware Court of Chancery had met all mandatory due process requirements in that it had made an "express ruling, following argument on the issue, that the class representatives fairly and adequately protected the interests of the class."[11] Following this critical holding, the United States Supreme Court reversed and remanded the federal class action to the Ninth Circuit.

On remand to the Ninth Circuit, the Epstein plaintiffs continued to maintain that the Delaware settlement proceeding did not afford them due process. Specifically, they asserted that Vice Chancellor Hartnett acted "in a bizarre manner" in approving the settlement and that Vice Chancellor Hartnett's, as well as the Delaware Supreme Court's, supervision of the Delaware settlement proceeding was "constitutionally inadequate." On October 22, 1997, a panel of the Ninth Circuit ruled in favor of the Epstein plaintiffs, effectively reinstating its first *Epstein* ruling.[12] The Ninth Circuit on rehearing, however, later withdrew the panel's ruling, and held that "the Delaware judgment was not constitutionally infirm."[13] The Ninth Circuit stated: "if the Delaware judgment had not met all due process requirements, the question decided [by the United States Supreme Court] in *Matsushita* would not have been reached, or even presented.... *Matsushita* would [have been] an advisory opinion."[14] On November 15, 1999, the United States Supreme Court denied the

Epstein plaintiffs' petition for a writ of *certiorari.*[15] Unbowed and undaunted, the *Epstein* plaintiffs next filed their Rules 24 and 60(b) motions in this Court on December 13, 1999. Briefing and argument followed. This decision is the latest chapter, probably not the last, in this case.

## II. ANALYSIS

### A. Intervention under Rule 24.

In order for the Epstein petitioners to seek relief under Rule 60(b), they must first establish their right to intervene under Court of Chancery Rule 24. That Rule provides in part:

> Upon timely application anyone will be permitted to intervene in an action: ... (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

■ It has been seven years since the Delaware Supreme Court affirmed the Court of Chancery decision to approve the settlement. Even before that ruling, however, the Epstein petitioners had abjured the courts of Delaware in favor of litigating in federal court. They had alternative routes to attack the Delaware settlement, even if they did not favor the opt-out route because of its problematic effect on the viability of a future federal class.

---

**10.** *Matsushita,* 516 U.S. at 378, 116 S.Ct. 873.

**11.** *Id.* at 379 n. 5, 116 S.Ct. 873.

**12.** *Epstein v. MCA, Inc.,* 126 F.3d 1235, 1237 (9th Cir.1997) (Judge O'Scannlain dissenting, "the majority and the Supreme Court do not share the same vision"), *op. withdrawn,* 179 F.3d 641 (9th Cir.1999).

**13.** 179 F.3d at 650.

**14.** *Id.* at 646.

**15.** *Epstein v. Matsushita Elec. Indus. Co.,* 528 U.S. 1004, 120 S.Ct. 497, 145 L.Ed.2d 384 (1999).

The petitioners were free to appear and object at the fairness hearing before Vice Chancellor Hartnett. Other objectors did so. Petitioners were also free to seek further review (as other objectors did) of Vice Chancellor Hartnett's decision from the Delaware Supreme Court and ultimately (although remotely) from the Supreme Court of the United States. Even then, in 1993, immediately after the Delaware Supreme Court affirmed Vice Chancellor Hartnett's decision, petitioners could have timely sought intervention and Rule 60(b) relief. They did not do this, however. Instead petitioners elected to pursue a broad claim that federal plaintiffs, by not participating in a state court settlement proceeding, have a right to attack collaterally the state proceeding, to relitigate issues of adequate representation and fairness of the settlement in the federal action. Against this background of strategic behavior, none of the arguments plaintiffs make about the timeliness of their motion is persuasive.

Plaintiffs argue that *Scureman v. Judge*[16] controls in this case. I disagree. *Scureman* involved a motion for Rule 60(b) relief that was filed five years after this Court's 1992 original judgment. The 1992 judgment determined that a public right-of-way was open and accessible to the public and that the right-of-way was located on solid ground alongside the shoreline of a public waterway. Following the Delaware Supreme Court's affirmance of this Court's decision, some of the litigants in the 1992 Chancery action attempted to have the effect of the Court's decision mooted by obtaining legislation that would have reversed the Court's 1992 decision. That effort failed. Next, the litigants sought administrative relief; they tried to persuade the state transportation depart-

ment to vacate the public right-of-way. That effort also failed. Ultimately, the litigants filed motions for relief under Rule 60(b)(6) on grounds that the Court's 1992 decision caused extreme hardship to the litigants and resulted in a manifest injustice. The Court of Chancery granted the motion for relief under Rule 60(b)(6), finding that its earlier determination had caused a significant hardship that was unforeseen at the time of the Court's original decision. These unforeseen circumstances qualified as "extraordinary," warranting relief under Rule 60(b)(6) to correct a manifest injustice.

The *Scureman* decision is not helpful to the petitioners. The *Scureman* movants were actively involved in the original litigation in the Delaware Court of Chancery. They did not abjure participation in the underlying litigation; they litigated the issue in this Court and exhausted their appeal to the Supreme Court. When they ultimately failed to overturn the decision's effect via legislation and administrative action, they returned to Chancery seeking Rule 60(b) relief. *Scureman* did not involve the same tactical decision making by litigants as is involved in this matter. In addition, *Scureman* did not involve an issue of timeliness under Rule 24 for the simple reason that the original litigants also were the petitioners for relief under Rule 60(b).

*In re U.S. Robotics Corp.,*[17] not *Scureman*, is instructive here. In *U.S. Robotics*, former shareholders of an acquired company moved to reopen a final judgment on a class action settlement. They contended that an SEC form, not filed until after the court entered judgment, revealed that defendant had overstated its earnings. Vice Chancellor Strine noted that mem-

**16.** Del.Ch., C.A. No. 1486–S, Jacobs, V.C. (June 26, 1998) 1998 WL 409153.

**17.** Del.Ch., C.A. No. 15580, 1999 WL 160154, Strine, V.C. (Mar. 15, 1999).

bers of the plaintiffs' committee of the whole represented the movants and "had it within their ability to inform this court within no more than two weeks of entering the Final Judgment that there were grounds to reopen."[18] Just like this case, the *U.S. Robotics* movants made "strategic decisions" to assert federal securities claims relating to the same challenged transaction against the same defendants in California.[19] Vice Chancellor Strine observed "[i]t is shocking that it took more than a year for the Rule 60(b) motion to be filed," and held that "[t]o sanction untimely action of this sort would set a negative precedent and contribute to a lack of professional diligence by lawyers."[20]

A one-year delay concerned Vice Chancellor Strine in *U.S. Robotics*. The Epstein petitioners have delayed seven times longer. They had ample time to move in Delaware for what they now seek. They could have appeared and objected to the settlement. Immediately after the Delaware Supreme Court's summary affirmance, they could have moved to vacate under Rule 60(b) *on the very grounds* that they now move to vacate this judgment. Instead, however, petitioners chose, for purely strategic reasons, to pursue a collateral attack in federal court. "If federal plaintiffs fear that state courts do not take sufficient account of federal interests, they should appear in state court and argue their case—rather than sit back and attack a state court settlement collaterally."[21] By *timely* raising objections in state court, federal plaintiffs will ensure that state courts have the requisite information to decide whether representation is adequate and the settlement is fair. This will give

state courts an added incentive to abstain from settling exclusive federal claims when federal interests so require.[22] This Court cannot force a party to litigate in Delaware against its wish, but it can refuse to countenance a belatedly filed motion born out of a desire to litigate elsewhere.

### B. Relief Under Rule 60(b).

#### 1. Rule 60(b)(4).

 Despite my ruling on the motion to intervene, I will, given the long history of this case, entertain some of the Epstein petitioners' arguments on the merits to resolve a few lingering questions. Petitioners argue that the Delaware judgment is "void," justifying relief under Rule 60(b)(4), because it denied petitioners and the class due process. I reject this contention.

No one can reasonably doubt that this Court afforded the class due process. Notice of the settlement was given to every class member. The Court of Chancery received papers and heard oral argument on the first and the second proposed settlement, wrote two opinions addressing the settlement and the related objections, decreased plaintiffs' attorneys' fees, and refused to sign the parties' proposed order and final judgment until the parties amended it. The Court specifically addressed (and rejected) the objectors' collusion argument—which went to the heart of the adequate representation issue. The Delaware Supreme Court considered the objectors' arguments, and it affirmed the Court of Chancery's final order. Likewise, the United States Supreme Court held

---

18. *Id.* at *9.

19. *Id.* at *14.

20. *Id.* at *9.

21. M. Kahan & L. Silverman, Matsushita and Beyond: The Role of State Courts in Class Actions Involving Exclusive Federal Claims, 1996 Supreme Court Review 219, 279.

22. *Id.*

that the class members had an opportunity to be heard.[23] Petitioners and the class have enjoyed full due process in this litigation.

■ In addition, I consider myself bound by the law of the case as to the question whether petitioners have been afforded due process of law on the adequacy of representation issue. The Delaware Supreme Court affirmed the Chancery judgment in this case on September 21, 1993. In so doing, the Supreme Court surely was aware of the legal requirements, clearly expressed in *Prezant v. DeAngelis*[24] only four months later, that the Court of Chancery must make an express finding of adequate representation as a prerequisite to approving a class action settlement under Chancery Rule 23. By affirming Vice Chancellor Hartnett's judgment approving the settlement of the MCA class action, the Delaware Supreme Court implicitly affirmed, albeit by summary order, Vice Chancellor Hartnett's adequacy determination. For this reason, the Supreme Court's affirmance on the adequacy of representation question is absolutely binding upon the trial court, under the law of the case doctrine.[25] The law of the case doctrine, however, would *not* operate as an absolute bar to reconsideration of this issue by the Delaware Supreme Court itself, assuming that the Delaware Supreme Court concluded that its own previous decision was clearly erroneous and would work a manifest injustice.[26] That is a question only the Delaware Supreme

Court can answer. Therefore, I conclude that petitioners are not entitled to relief under Rule 60(b)(4), and this Court could not grant such relief even were they deserving of it, because of the law of the case doctrine.

*2. Rule 60(b)(3).*

■ Rule 60(b)(3) allows this Court to relieve a party from a final judgment when the adverse party engages in fraud or misrepresentation in obtaining the judgment. The Epstein petitioners contend that "suspicious circumstances," and perhaps fraudulent conduct, surrounded the entering of Vice Chancellor Hartnett's February 22, 1993 Order. They urge me to relieve them from the judgment under Rule 60(b)(3). Petitioners have aimed a very serious charge right at the heart of Delaware plaintiffs' counsel. I have carefully considered this accusation and I have examined the record in this case. In the end, however, I find that the charge is not supported by any credible evidence.

Here are the facts: Vice Chancellor Hartnett asked the parties to submit a proposed order that conformed to his rulings. That request was not unusual when made, and is still a common practice in this Court. Delaware class counsel submitted the requested form of judgment order reflecting the Court's determination on the hotly-contested issue of collusion and fairness of the settlement. The order also provided for an extended opt-out deadline in accordance with Vice Chancellor Hartnett's written ruling. The submitted form

---

**23.** See *Epstein,* 179 F.3d at 645 (the Ninth Circuit stating that the U.S. Supreme Court "satisfied itself that the due process requirements necessary to bind the absent class members were met").

**24.** Del.Supr., 636 A.2d 915 (1994).

**25.** See, *e.g., Insurance Corp. of America v. Barker,* Del.Supr., 628 A.2d 38, 40 (1993); 5 CJS Appeal and Error § 975c at 479 (law of

the case doctrine applies to and comprehends all points presented and decided and necessarily involved in the appeal, and all matters decided by necessary implication).

**26.** See *Westbrook v. Zant,* 743 F.2d 764, 768 (11th Cir.1984), cited in *Gannett v. Kanaga,* Del.Supr., 750 A.2d 1174 (2000) (Chandler, C., dissenting).

of order was three-and-one-half pages long. The adequacy of representation determination appeared in the very first paragraph. Class counsel's cover letter to the Vice Chancellor referenced the opt-out provision that the Court had mandated. It did not, however, reference the language relating to the adequacy of representation or to other particular rulings by the Vice Chancellor.

From this, the Epstein petitioners charge that Delaware class counsel "duped" Vice Chancellor Hartnett into signing the final judgment order without understanding it or reading it. This is a serious accusation. But no evidence whatsoever supports it, let alone evidence capable of meeting the high Rule 60(b) standard, which requires "the most egregious conduct involving a corruption of the judicial process itself."[27] The Epstein petitioners fall far short of meeting Rule 60(b)(3)'s standard for fraud, misrepresentation or other misconduct necessary to vacate a judgment. Sinister suspicions and "dark imaginings" are not enough. A party must point to evidence or facts that would lead a reasonable mind to the conclusion that an adverse party improperly obtained a final judgment. The Epstein petitioners have failed to proffer facts of that caliber in this case.

## III. CONCLUSION

The Epstein petitioners made a strategic decision to avoid participation in the Delaware proceedings. After being given notice of the Delaware class action settlement and its effect on the federal claims, they refused to opt out, as they were entitled to do. They also refused to appear in Delaware to object to the settlement. Petitioners chose not to advise this Court of their view that the class plaintiffs and class counsel in Delaware were not adequate class representatives. Other objectors did appear and did challenge the settlement, which this Court ultimately approved after determining that the class was adequately represented and the settlement was fair to the class. In contrast, the Epstein petitioners strategically chose to collaterally attack the Delaware judgment. This failed. Now, seven years after the Delaware judgment was entered, the Epstein petitioners seek leave to intervene for purposes of reopening the Delaware judgment. This effort must fail too, as it is untimely, barred by the law of the case doctrine, and without substantive merit. I have entered an Order accordingly.

---

**27.** 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2870, at 418–19 (1995) (citation omitted).