In re MCA, INC., Shareholder Litigation, Lawrence Epstein and John Linder, Petitioners Below, Appellants,

v.

MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., Matsushita Holding Corp., MCA, Inc., Lew W. Wasserman, Thomas V. Jones, Robert S. Strauss, Thomas Wertheimer, Howard H. Baker, Jr., Thomas P. Pollack, Felix G. Rohatyn, Sidney J. Sheinberg, Howard P. Allen, Mary Gardiner Jones, and Charles S. Paul, Defendants Below, Appellees,

and

Seymour Lazar, A.J. Lou, Marion Lord, Sheldon Shore, Harry Osgood, Barnett Stepak, Julius Ostreicher, Thomas E. Acito, Darren Suprina, Sara Naphtali, Stephania Ziemak, Kenneth Pogrob, Elriede Glancy, Jacob Gottlieb and C. Christopher Muth as Trustee for The Carl H. Muth Trust, Plaintiffs Below, Appellees.

No. 448, 2000.

Supreme Court of Delaware.

Submitted: July 24, 2001.
Decided: Nov. 16, 2001.

Joel Friedlander, Bouchard Margules & Friedlander, Wilmington, Delaware, Stuart L. Shapiro, (argued), Shapiro Forman & Allen LLP, New York City, Roger W. Kirby, Peter S. Linden, Kirby McInerney & Squire, LLP, New York City, Henry P. Monaghan, New York City, for appellants Lawrence Epstein and John Linder.

Anne Foster, Richards, Layton & Finger, Wilmington, Delaware, Barry R. Ostrager, (argued), Mary Kay Vyskocil, Joseph M. McLaughlin, Simpson Thacher & Bartlett, New York City, for defendants below appellees Matsushita Electric Industrial Co., Ltd. and Matsushita Holding Corp.

Joseph A. Rosenthal, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware, Steven G. Schulman, (argued), U. Seth Ottensoser, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, for appellees.

Martin P. Tully, (argued), Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Theodore N. Mirvis, Alexander Shaknes, Wachtell, Lipton, Rosen & Katz, New York City, for appellees former MCA Directors.

Before: WALSH, HOLLAND, BERGER and STEELE, Justices, and RIDGELY, President Judge.*

* Assigned pursuant to art. IV, § 23 of the Delaware Constitution and Supreme Court Rule

WALSH, J.

This is an appeal from a decision of the Court of Chancery which rejected efforts to vacate a 1993 judgment of that court approving a global settlement of claims arising out of the acquisition of MCA, Inc. and Matsushita Electric Industrial Company. The appellants, original plaintiffs in one aspect of the multi-faceted litigation which the merger spawned, contend the Court of Chancery erred in viewing their attempt at intervention as untimely and in rejecting their claims that the judgment approving the settlement was procured by fraud.

■ While we conclude that the appellants' status as original parties to the litigation does not require them to assert a timely intervention, we find no abuse of discretion in the Court of Chancery's determination that the settlement judgment was not procured by fraud or void for a specific determination of adequacy of representation. Accordingly, we affirm.

## I

The background of this litigation is extensive and is set forth in decisions of the Court of Chancery, this Court, the 9th Circuit Court of Appeals and the United States Supreme Court.[1] We recite only the facts pertinent to an understanding of the present appeal.

On September 25, 1990, *The Wall Street Journal* reported that Matsushita Electric Industrial Company ("Matsushita"), was negotiating a potential acquisition of MCA, Inc. ("MCA"). The following day three class action complaints were filed in the Court of Chancery. These three actions, styled as individual and class actions, were consolidated for all purposes by then Vice Chancellor Hartnett on October 2, 1990 (the "Delaware Action"). The Complaints alleged, *inter alia*, that the proposed sale of MCA to Matsushita violated the fiduciary duties of the directors of MCA. Specifically, it was alleged that the board violated its *Revlon* duties by not initiating an auction process to maximize shareholder value in a cash sale of the company. The Complaints further alleged that the defendant directors of MCA violated their duties under *Revlon* by wrongfully using a poison pill to thwart other potential bidders.

On November 26, 1990, MCA and Matsushita announced that they had entered into an agreement and plan of merger (the "Merger Agreement"). The Merger Agreement provided that Matsushita Acquisition Corporation ("Matsushita Acquisition") would make a tender offer for all of the outstanding shares of MCA common stock at $66 per share (the "Tender Offer"). Matsushita Acquisition was to merge with and into MCA following successful completion of the Tender Offer. MCA and Pinelands, Inc., ("Pinelands"), a subsidiary of MCA that held its broadcasting rights, entered into a separate agreement pursuant to which 100% of those broadcasting rights would be spun off to MCA shareholders. This transaction was estimated to provide $5 per share additional value to MCA's shareholders.

2(a).

**1.** *In re MCA, Inc., Shareholders Litig.*, Del.Ch., 598 A.2d 687 (1991) (*MCA I*); *In Re MCA, Inc., Shareholders Litig.*, Del.Ch., 1993 WL 43024 (Feb. 16, 1993) (*MCA II*); *aff'd*, Del. Supr., 633 A.2d 370 (1993); *Epstein v. MCA, Inc.*, 9th Cir., 50 F.3d 644 (1995) (*Epstein I*), rev'd, *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *Epstein v. MCA, Inc.*, 9th Cir., 126 F.3d 1235 (1997) (*Epstein II*), withdrawn and superseded on rehearing by *Epstein v. MCA, Inc.*, 9th Cir., 179 F.3d 641 (1999) (*Epstein III*), *cert. denied* 528 U.S. 1004, 120 S.Ct. 497, 145 L.Ed.2d 384 (1999); *In re MCA, Inc. Shareholders Litig.*, Del.Ch., 774 A.2d 272 (2000).

MCA's Chairman of the Board and Chief Executive Officer, Lew Wasserman ("Wasserman"), was the owner of 4,953,927 MCA shares worth $351,728,817 at the tender price. To avoid a massive tax liability, Wasserman and Matsushita entered into a separate Capital Contribution and Loan Agreement (the "Contribution Agreement") to exchange his MCA shares for preferred stock in a Matsushita subsidiary, MEA Holdings. This preferred stock paid an 8.75% annual cumulative dividend, was secured by letters of credit, and was redeemable at the tender price upon the death of either Wasserman or his wife. The exchange was set to take place immediately following the time at which shares of MCA were accepted for payment pursuant to the Tender Offer.

MCA also entered into other agreements with MCA's President and Chief Operating Officer, Sidney J. Sheinberg ("Sheinberg"), and record producer David Geffen, MCA's largest individual shareholder. Sheinberg owned 1,179,635 shares of MCA stock that he tendered into Matsushita's Tender Offer. Two days after tendering his shares, Sheinberg received an additional $21 million in cash, which has been attacked as a covert premium designed to induce Sheinberg to tender his shares.

On December 3, 1990, an action was filed in the United States District Court for the Central District of California (the "District Court") designated as *Epstein v. MCA, Inc. et al.*, No. CV–90–6451–R (the "federal action"). Four additional purported class actions alleging similar claims were also filed in the District Court and were consolidated by the District Court on April 1, 1991. The consolidated complaint alleged that the Matsushita Tender Offer violated Section 14(d)(7) of the Securities and Exchange Act of 1934 and SEC Rules 14d–19 and 10b–13 by offering preferential treatment in the Tender Offer to Wasserman and Sheinberg. These claims had not been asserted in the complaints filed in the Delaware Action.

On December 14, 1990, plaintiffs in the Delaware Action filed an amended complaint seeking preliminary injunctive relief against consummation of the Tender Offer. The plaintiffs alleged in the amended complaint that the Tender Offer materials failed to disclose the preferential treatment allegedly given to Wasserman. Moreover, the amended complaint challenged the Sheinberg transaction as violative of Delaware law. Finally, the amended complaint named Matsushita as a defendant, alleging that Matsushita aided and abetted MCA in a breach of fiduciary duty by entering into the transaction with Wasserman. A preliminary injunction hearing was scheduled for December 18, 1990.

On December 18, 1990, the Delaware Action was provisionally certified as a class action [2] by the Court of Chancery pursuant to Rule 23(b)(2) with the class to consist of all owners of MCA common stock on September 25, 1990. That same day, the parties in the Delaware Action filed a Stipulation and Agreement of Compromise and Settlement (the "Initial Proposed Settlement"). The Initial Proposed Settlement provided for the dismissal of the Delaware Action and the release of all claims of any member of the class arising out of the Merger, including the claims raised in the federal action, in exchange for the payment of attorneys' fees and the modification of a "poison pill" [3] in the charter of the

2. The Court of Chancery order recited a certification for settlement purposes only.

3. The modification provided that the "poison pill" would be automatically redeemable upon the receipt of an all cash, fully financed

Pinelands subsidiary. A notice of the Initial Proposed Settlement was sent to all MCA shareholders who were members of the class. Andrew and David Minton, (the "Mintons") entered their appearance as objectors at the settlement hearing. The Mintons objected to the Initial Proposed Settlement in so far as it barred individual federal actions filed by them in the District Court.

On December 29, 1990, the Tender Offer was completed. More than 90% of all the outstanding shares were tendered in response to Matsushita's offer. Immediately following the Tender Offer, the Capital Contribution Agreement was consummated when Wasserman exchanged his MCA common stock for preferred stock in MEA Holdings. On January 3, 1991, Matsushita acquired MCA for $6.1 billion.

On April 22, 1991, the Court of Chancery rejected the Initial Proposed Settlement as inadequate. *See In re MCA, Inc. Shareholders Litig.*, Del.Ch., 598 A.2d 687, 696 (1991) (*"MCA I"*). The court first ruled that certification of the class pursuant to Chancery Rule 23(b)(1) and (2) was appropriate and that no opportunity to opt out was required because the claims originally sought equitable relief when filed. *See id.* at 692. Regarding the terms of the Initial Proposed Settlement, the court found that the state law claims asserted in the amended complaint were "at best, extremely weak." [4] *Id.* at 694. The court did conclude that the federal securities law claims had at least "arguable merit" since they had not yet been definitively addressed by the District Court. *Id.* at 695. Furthermore, the court found that "[t]he

value to the Class from the Pinelands revised poison pill is therefore illusionary and the revision apparently was proposed merely to justify a settlement which offers no real monetary benefit to the Class." *Id.* at 696. Because the benefits to the class were minimal, the court determined that it would "be unfair to compel the release of the federal claims by approving the settlement in its present form," which did not provide class members with the opportunity to opt out. *Id.* at 696.

On April 1, 1991, the District Court rejected the plaintiffs' motion for class certification in the federal action. A second motion for class certification was rejected on September 3, 1991. On August 13, 1991, the District Court dismissed the SEC Rule 10b–13 claims because it concluded that there was no private right of action under that provision. Thereafter, on February 10, 1992, Matsushita was awarded summary judgment on all counts. The District Court concluded that the Wasserman transaction did not take place within the Tender Offer period and that Wasserman did not receive a greater consideration than other shareholders. Following this decision, the Epstein plaintiffs filed an appeal to the Ninth Circuit Court of Appeals challenging the district court's grant of summary judgment, as well as prior decisions denying class certification and finding the Epstein plaintiffs and counsel in contempt of a discovery order.

On October 22, 1992, the parties in the Delaware Action filed the second stipulation of global settlement releasing the federal and state claims (the "Settlement") for

---

tender offer for all of the shares of Pinelands that is held open for 60 days and that has at least two-thirds of all outstanding shares tender into the offer. Apparently, this was done to make Pinelands a more attractive acquisition target and potentially provide more value to the MCA shareholders who received the

Pinelands stock dividend. The altered pill was required to remain in effect for only one year.

4. Despite this characterization, Matsushita did not move thereafter to dismiss the action.

$2 million, less $575,000 in fees and expenses sought by class counsel. The Settlement consideration for the class amounted to approximately two to three cents per share and provided the class members with opt out rights. Three members of the class objected to the proposed settlement.[5] Vice Chancellor Hartnett concluded that the $2 million recovery was "barely" adequate to support the Settlement. *See In re MCA, Inc., Shareholders Litig.*, Del.Ch., 1993 WL 43024 at *4 (1993) *reprinted in,* 18 Del.J. Corp. L. 1053 ("*MCA II*"). The court approved the Settlement over the arguments of the objectors, who contended that the plaintiffs in the Delaware Action colluded with MCA and Matsushita to settle the dispute in exchange for a *de minimis* benefit to the class and an award of attorneys' fees. The Court of Chancery noted the District Court's dismissal as an indication that the federal securities law claims were of "minimal" value but that, in any event, "[t]he availability of the right to opt-out of the class protects the ability of class members ..." who wish to continue the federal litigation. *Id.* Indeed, due to concern that some shareholders may not have received timely notice of the Settlement, the Vice Chancellor extended the opt out deadline and requested that the proposed order implementing the opinion be amended to reflect that extension. *See MCA II*, 1993 WL 43024 at *7.

On February 17, 1993, class counsel submitted an amended proposed order and final judgment (the "Amended Order") that extended the opt out deadline. The cover letter accompanying the Amended Order stated that it had been approved by counsel for the settling parties and copies of the Order were sent to all counsel involved, including objectors. The Amended Order also contained a provision that stat-

ed: "and it is hereby further determined that the plaintiffs in the Actions, as representatives of the Settlement Class, have fairly and adequately protected the interests of the Settlement Class and that the maintenance of the action as a class action meets all the requirements of Rule 23(a) and (b)(3) of the Court of Chancery." The Judgment was signed by the Vice Chancellor on February 22, 1993.

The Minton objectors appealed the Court of Chancery's approval of the Settlement to this Court. In that appeal, the Objectors argued, *inter alia,* that the Settlement should not have been approved because it compromised viable federal securities law claims pending in California. The objectors did not assert any claims with regard to the adequacy of the class representatives. After hearing argument, this Court summarily affirmed the Vice Chancellor's decision approving the Settlement.

On February 24, 1993, Matsushita sought dismissal of the Epstein Action in the Ninth Circuit Court of Appeals based on the terms of the Settlement. The Epstein plaintiffs asserted, however, that the Court of Chancery lacked the authority to approve the release of exclusively federal claims and that therefore the judgment approving the settlement was not binding on parties to the federal action. The Ninth Circuit agreed, concluding that the Delaware judgment was not entitled to full faith and credit. *See Epstein v. MCA, Inc.,* 9th Cir., 50 F.3d 644 (1995) ("*Epstein I*") *rev'd Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). The Ninth Circuit reversed the decision of the District Court and vacated the grant of summary judgment in favor of Matsushita on all claims.

---

5. None of the objectors raised the issue of the adequacy of the class representatives.

Matsushita petitioned for a writ of *certiorari*, which was accepted by the United States Supreme Court as to one question: "whether a federal court may withhold full faith and credit from a state-court judgment approving a class-action settlement simply because the settlement releases claims within the exclusive jurisdiction of the federal courts." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 369, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996). The Supreme Court reversed, holding that "a federal court must give the judgment the same effect that it would have in the courts of the State in which it was rendered." *Id.* at 369, 116 S.Ct. 873. Accordingly, the Court remanded the matter to the Ninth Circuit.[6]

On October 22, 1997, a panel of the Ninth Circuit held that the class members had been deprived of due process by inadequate representation at the Delaware Settlement hearing. *See Epstein v. MCA, Inc.*, 9th Cir., 126 F.3d 1235 (1997) ("*Epstein II*"), *withdrawn and superseded on rehearing by Epstein v. MCA, Inc.*, 9th Cir., 179 F.3d 641 (1999). On June 7, 1999, a reconstituted panel of the Ninth Circuit withdrew the *Epstein II* opinion. *See Epstein v. MCA, Inc.*, 9th Cir., 179 F.3d 641 (1999) ("*Epstein III*"). The court ruled that "the Delaware judgment was not constitutionally infirm." *See id.* at 650. On November 15, 1999, the United States Supreme Court denied the Epstein plaintiffs' petition for a writ of *certiorari*.[7]

On December 13, 1999, the Epstein plaintiffs filed a motion in the Court of Chancery seeking to intervene and vacate the court's settlement approval order in *MCA II*. Initially, the Court of Chancery denied Petitioners' Motion to Intervene on the ground that it was not timely. *See In re MCA, Inc. Shareholders Litig.*, Del.Ch., 774 A.2d 272, 278 (2000). The court noted that the Petitioners could have appeared and objected to the settlement before it was approved by the court. The Court of Chancery seemed particularly troubled by the fact that Petitioners chose not to participate in the Delaware proceedings, instead asserting in the District Court that they were not bound by the settlement. *See* 774 A.2d at 276 ("Even before that ruling, however, the Epstein petitioners had abjured the courts of Delaware in favor of litigating in federal court."). The court concluded that the Motion to Intervene was untimely because the Epstein Plaintiffs had seven years to appear in

**6.** Responding to the Epstein plaintiffs' argument that inadequate representation deprived the absent class members of due process of law, an argument that had not been raised in the court below, the Supreme Court responded in a footnote that:

Apart from any discussion of Delaware law, respondents contend that the settlement proceedings did not satisfy due process because the class was inadequately represented. Respondents make this claim in spite of the Chancery Court's express ruling, following argument on the issue, that the class representatives fairly and adequately protected the interests of the class. *Cf. Prezant v. De Angelis*, 636 A.2d 915, 923 (Del.1994) ("[The] constitutional requirement [of adequacy of representation] is embodied in [Delaware] Rule 23(a)(4), which requires that the named plaintiff 'fairly and adequately protect the interests of the class' "). We need not address the due process claim, however, because it is outside the scope of the question presented in this Court. *Matsushita*, 516 U.S. at 379 n. 5, 116 S.Ct. 873 (citations omitted). In a separate opinion, Justice Ginsburg addressed the inadequate representation argument and noted that the question "remain[ed] open for airing on remand." *Id.* at 399 & n. 11, 116 S.Ct. 873 (Ginsburg, J., concurring in part and dissenting in part).

**7.** On July 20, 2000, the Ninth Circuit panel issued an Order providing that those MCA shareholders who opted out of the Settlement can proceed to trial against Matsushita.

Delaware and challenge the Settlement and neglected to do so. *See id.* at 278.

Despite the finding of untimeliness, the Chancellor proceeded to address the remaining claims raised by the Epstein plaintiffs. *See id.* at 278 ("Despite my ruling on the motion to intervene, I will, given the long history of this case, entertain some of the Epstein petitioners' arguments on the merits to resolve a few lingering questions."). Addressing the Epstein plaintiffs' contention that the Judgment approving the Settlement was void "because it denied petitioners and the class due process," the Chancellor ruled that it was beyond doubt that the class was afforded due process. Moreover, the court held that it was bound by the law of the case doctrine, stating that the Delaware Supreme Court "implicitly affirmed, albeit by summary order, Vice Chancellor Hartnett's adequacy determination." *See id.* at 279. The Epstein plaintiffs' final claim alleged that suspicious circumstances and perhaps fraudulent conduct surrounded the entering of the Settlement Order and that the Judgment should be reopened pursuant to Rule 60(b)(3). The Chancellor rejected this claim, holding that the charge of misconduct on the part of class counsel was "not supported by any credible evidence." *See id.* This appeal followed.

## II

Essentially, the Epstein plaintiffs make two major arguments. First, they contend that the judgment in this case is void because there was no finding by the Court of Chancery in approving the Settlement that the named plaintiffs were adequate representatives of the entire class. This deficiency, it is argued, renders the Settlement violative of due process of law and transgresses Court of Chancery Rule 23(a)(4). They further argue that the Chancellor neglected to address this question below. Second, it is contended that the Court of Chancery erred in refusing to grant their motion to vacate the Settlement Judgment for reasons of fraud perpetrated on the court by class counsel.

The class plaintiffs have joined their erstwhile foes, Matsushita and MCA, in resisting the efforts of the Epstein plaintiffs to reopen the settlement judgment. They contend that the Settlement Approval Judgment was entered under terms which afforded the class members due process and that the Chancellor did not abuse his discretion in denying Appellants' motion to reopen that judgment.

■■■ A motion to reopen a judgment under Court of Chancery Rule 60(b) is addressed to the sound discretion of the trial court. This Court's review of the grant or denial of such a motion is for an abuse of discretion. *Battaglia v. Wilmington Sav. Fund Soc.,* Del.Supr., 379 A.2d 1132, 1135 (1977); *see also Wife B. v. Husband B.,* Del.Supr., 395 A.2d 358 (1978) (same).[8] "An abuse of discretion

---

8. The Epstein plaintiffs contend that this Court should review the Chancellor's dismissal of their Rule 60(b)(4) motion *de novo* on the basis that whether a judgment is void is a question of law. For support, the Epstein plaintiffs cite *State v. Moore,* Del.Super., No. N91–07–1485M, 1992 WL 354194, Cooch, J. (Nov. 6, 1992), where the Superior Court granted the defendant's motion under Rule 60(b)(4) and vacated an order declaring the defendant an habitual offender because it

found that service was not proper. The court stated that it had "no discretion under ... Rule 60(b)(4) to decline to vacate a void order, because a void order is legally ineffective from its inception." *See* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2862 (1995) (hereinafter "Wright & Miller") ("There is no question of discretion on the part of the court when a motion is under 60(b)(4) .... [e]ither a judgment is void or it

occurs when 'a court has ... exceeded the bounds of reason in view of the circumstances, [or] ... so ignored recognized rules of law or practice so as to produce injustice.'" *Lilly v. State,* Del.Supr., 649 A.2d 1055, 1059 (1994) (quoting *Firestone Tire & Rubber Co. v. Adams,* Del.Supr., 541 A.2d 567, 570 (1988)).

■ On appeal from the grant or denial of a motion for relief under Rule 60(b) a party may attack only the propriety of the order; Rule 60(b) "does not permit the appellant to attack the underlying judgment for an error which he could have complained of on appeal from it." *Swann v. Carey,* Del.Supr., 272 A.2d 711, 712 (1970).

■ Court of Chancery Rule 60(b) permits a party to seek relief from a final judgment or order. Rule 60(b) provides, in part, that:

> On motion and upon such terms as are just, the Court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or ex-

cusable neglect; (2) newly discovered evidence; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Ch.Ct.R. 60(b). In addition, a trial court has the power "to set aside a judgment for fraud upon the Court." *See id.* A court does not have to wait for a party to make a motion for relief under this section; rather a court may take independent action to relieve a party from a judgment pursuant to this rule. *See id.*

■ There are two significant values implicated by Rule 60(b). The first is ensuring the integrity of the judicial process and the second, countervailing, consideration is the finality of judgments.[9]

is valid. Determining which it is may well present a difficult question, but when that question is resolved, the court must act accordingly."). The basis for the Epstein plaintiffs' claim that the judgment is void, however, is that Vice Chancellor Hartnett's finding of adequate representation was not supported by the record. That assertion, when subsequently addressed by the Chancellor, required the court to examine the conduct of the parties, as well as the perceived intention of the court entering the judgment, a weighing process that necessarily requires deference from a reviewing court.

9. Counsel for the Class plaintiffs contend that in order to succeed on a Rule 60(b) motion the moving party must show "extraordinary circumstances" require reopening or vacating the judgment. Such a showing is only required, however, where a party makes a motion under Rule 60(b)(6), the catchall provision of Rule 60(b). *See, e.g., Dixon v. Delaware Olds, Inc.,* Del.Supr., 405 A.2d 117, 119

(1979) ("Federal case law under Rule 60(b) of the Federal Rules of Civil Procedure holds that the standard or test for granting a(b)(6) motion is a showing of 'extraordinary situation or circumstances'."). The standard required to succeed under other sections of Rule 60(b) is not as exacting. *See* Wright & Miller, § 2857 ("the leading cases speaking of a requirement of exceptional or extraordinary circumstances have been cases of motions under 60(b)(6). That subdivision of the rule does require a very special showing by the moving party and it does not assist sound analysis to repeat those phrases in cases brought pursuant to the other portions of Rule 60(b), under which a less demanding standard applies. Although 'extraordinary circumstances' should only be required under catchall clause (6) of the rule, some courts have erroneously restricted relief under other provisions of the rule by reading that requirement into earlier clauses") (citations omitted).

*See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, Del. Ch., 1996 WL 757274 at *1, Allen, C. (Dec. 20, 1996). Because of the significant interest in preserving the finality of judgments, Rule 60(b) motions are not to be taken lightly or easily granted.[10] A proper standard must strike a balance between the interest in bringing litigation to an end and the countervailing concern that justice is carried out. *See* Wright & Miller, § 2851.

## III

Our task, then, is to determine whether the Chancellor abused his discretion in denying the Epstein plaintiffs' motion to vacate the Judgment pursuant to Rule 60(b)(4). The Epstein plaintiffs contend that the Judgment is void because the record does not support a finding that the class was adequately represented. The Chancellor held that then Vice Chancellor Hartnett addressed the adequacy of representation issue when he considered the Objectors' collusion argument. *See MCA*, 774 A.2d at 278. In addition, the Chancellor found that he was bound by the law of the case doctrine as to the adequacy issue because this Court affirmed the Vice Chancellor's approval of the Settlement.

 Court of Chancery Rule 23(a) sets out four requirements that must be met in order for a representative party to maintain an action on behalf of an entire class.[11] Pursuant to Court of Chancery Rule 23(a)(4), it must be demonstrated that the "representative parties will fairly and adequately protect the interests of the class." Ct.Ch.R. 23(a)(4). This requirement is more than a procedural technicality. Indeed, this requisite has constitutional dimensions rooted in the Due Process Clause of the United States Constitution. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (stating that the Due Process Clause requires "that the named plaintiff at all times adequately represent the interests of the absent class members"). In addition to adequate representation, absent class members must be afforded notice, an opportunity to be heard, and a right to opt out in order to be bound by a settlement. *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965. This is necessary to ensure that the interests of individuals who are not directly participating in the action, but who may be bound by the outcome, are sufficiently protected. If the principles of due process are not followed, members of the class cannot be bound by a judgment or settlement. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 388, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (Ginsburg, J., concurring in part dissenting in part) ("In the class action setting, adequate rep-

---

**10.** See, e.g., *Metlyn Realty Corp. v. Esmark, Inc.*, 7th Cir., 763 F.2d 826, 830 (1985), where the Seventh Circuit stated that:

> Judgments in civil cases fix the rights of parties and entitle them to go about their lives. They may be reopened only for extraordinary reasons.... There are good reasons for the stringent limits on reopening a final judgment.... If they know that the judgment will establish their rights once and for all, they will bring to bear the information and energies necessary to produce an informed decision. If they believe that they can have a second try, they are more likely to skimp the first time around,

and as a result the judicial process will become less accurate.

**11.** Rule 23(a) provides that:

> One or more members of a class may sue ... as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Ct.Ch.R. 23(a).

resentation is among the due process ingredients that must be supplied if the judgment is to bind absent class members.") (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. at 812, 105 S.Ct. 2965; *Prezant v. De Angelis*, Del.Supr., 636 A.2d 915, 923–924 (1994)).

In *Prezant v. De Angelis*, Del.Supr., 636 A.2d 915, 924 (1994), a case decided after the Settlement was approved in the present case, this Court considered whether adequate class representation was an indispensable requisite for approval of a class action settlement. This Court concluded that it was, stating that "[d]ue process requires . . . adequate representation before an absent class member can be bound by a settlement in a class action predominately for money damages." *See id.* at 924 (citing *Shutts*, 472 U.S. at 812, 105 S.Ct. 2965). Because of the constitutional implications regarding adequate representation, we determined that a finding of adequacy must be made by the trial court, on the record, before absent class members could be bound by a settlement. *See id.* (stating that "when claims of absent class members are being compromised, the appropriate course is for the Court of Chancery to make an explicit finding on the record that the action satisfies the criteria of Rule 23 and is thus properly maintainable as a class action"). This Court rejected the argument that approval of a settlement "carries with it an implicit determination that the action complies with the Rule 23 criteria, including adequate representation." *Id.* at 924. Rather, we held that the Court of Chancery is required to make an explicit finding, on the record, that the criteria for maintaining a class action have been met. *See id.* at 925. Indeed, this Court stated that "a class action settlement could not constitutionally bind absent class members without a judicial determination that the adequate representation requirement of

Rule 23(a)(4) has been satisfied." *See id.* at 924.

*Prezant*, however, did not directly apply at the time of the Settlement in this case. While *Prezant* determined the proper approach to be taken where a class action suit is being settled, its direction of explicit findings was not binding on the Court of Chancery at the time the Settlement was approved in this case. Therefore, when the Second Settlement was approved by the Vice Chancellor there was no requirement that a specific finding of adequacy be made on the record. The due process concerns embraced by this Court's decision in *Prezant*, however, were applicable at the time the Vice Chancellor approved the Settlement in this case.

■ The Epstein plaintiffs contend that the Court of Chancery failed to address their contention that the record did not support a finding that the named plaintiffs fairly and adequately protected the interests of the class, a finding required by *Prezant*. It is true that the Chancellor did not expressly address this argument. The Chancellor did determine, however, that the class was appropriately afforded due process. *See MCA III*, 774 A.2d at 278. In considering the Epstein plaintiffs' argument that the Judgment was void under Rule 60(b)(4) because there was no specific finding of adequacy on the record, the Chancellor found that "The Court specifically addressed (and rejected) the objectors' collusion argument—which went to the heart of the adequate representation issue." *See MCA III*, 774 A.2d at 278. As we indicated above, the Vice Chancellor was not required, pre-*Prezant*, to make an explicit finding of adequate representation on the record at the Settlement Hearing. Considerations of due process, however, did require recognition by the court of

adequate representation by the named plaintiffs.

Unfortunately, the Vice Chancellor did not make an explicit determination, based upon any record evidence, that the plaintiffs were adequate representatives of the class. What he did consider and reject was the argument that plaintiffs and their counsel were in collusion with the defendants. The objectors who appeared at the settlement hearing did not litigate the adequacy of their representation. While two of the objectors argued that the settlement was collusive, neither focused on the much broader issue of whether representation was constitutionally adequate. The only mention of adequacy of representation is found in an affidavit submitted by objector William Krupman stating that he opposed the settlement because "the purported class representatives . . . had proposed a settlement that benefitted no one but their own attorneys. They did not provide adequate representation." In his argument at the settlement hearing, however, objector Krupman did not address the constitutional adequacy of the representation, but argued only that the terms of the settlement were unfair. Since the Chancery Court could have found that representation was inadequate without also finding that it was collusive, litigation of the collusion issue would not necessarily constitute litigation of adequacy of representation.

In *Prezant*, this Court rejected defendants' assertion that court approval of a class action settlement carries with it an implicit determination that the action complies with the Rule 23 criteria, including adequate representation. *Id.* at 924. The problem with an implicit determination approach was illustrated by the trial court in *Prezant*, which made specific findings from which it could have been inferred that the plaintiff was an *inadequate* class representative, yet the settlement was approved anyway. *Id.* In the present case, there were no findings by the trial court from which it could be inferred that the plaintiffs were inadequate representatives. To the contrary, the court rejected the charge that plaintiffs were in collusion with the defendants. Furthermore, court-appointed counsel [12] for the plaintiffs included two of the most experienced shareholder litigation firms in the nation. Those attorneys conducted extensive pretrial discovery and their own analysis of the governing law, permitting them to evaluate the merits of both the Delaware and the federal claims. Moreover, the Court of Chancery's holding that there was no collusion is the equivalent of saying that the parties negotiated the settlement at arms length. *See Prezant*, 636 A.2d at 924 (stressing the need for "extensive document examination, depositions of adverse witnesses, securing expert advice on complicated issues, and aggressive negotiation at arms-length."). Finally, inferring the adequacy of representation from the trial court's finding that the plaintiffs were not in collusion with the defendants is not the same as implying a finding of adequacy from the mere fact that the settlement was approved, as was criticized in *Prezant*.

Discovery had been conducted in this case by class counsel prior to the settle-

---

**12.** The Court of Chancery has observed that adequacy of representation under Rule 23(a)(4) is generally dependent not only upon the ability of the named representative to represent the class fairly and adequately but also upon the qualifications, experience, and general ability of the representative's attorneys. *See Leon N. Weiner & Assoc. v. Krapf*, Del. Supr., 584 A.2d 1220, 1225 (1991); *Van de Walle v. Salomon Bros.*, Del.Ch., C.A. No. 9894, 1997 WL 633288, Steele, V.C. (Sept. 30, 1997); *Barbieri v. Swing–N–Slide Corp.*, Del. Ch., C.A. No. 14239, 1996 WL 255907, Steele, V.C. (May 7, 1996); *Glosser v. Cellcor*, Del. Ch., C.A. No. 12725, 1995 WL 106527, Allen, C. (Mar. 10, 1995).

ment submission and counsel was knowledgeable of the state and federal claims. In fact, on December 14, 1990, the class plaintiffs filed an amended complaint adding claims for violations of Delaware law arising out of the Wasserman and Sheinberg transactions, which were the basis for the federal claims. There is no doubt that the Vice Chancellor considered the viability of the federal claims, implicitly considering the adequacy of the class plaintiffs' representation. Moreover, as the Chancellor pointed out below, the Vice Chancellor specifically considered and rejected the argument raised by the Objectors that the class plaintiffs had colluded with the defendants in order to obtain a settlement. Implicit in this finding is a consideration of the adequacy of the representation by the class plaintiffs. To allay any concern on the issue, the Vice Chancellor required an opt out provision in order to protect the interests of any member of the class who had reservations about having their federal claims compromised through the efforts of the class plaintiffs. Significantly, the Epstein plaintiffs did not seek to opt out. The Chancellor's denial of the Epstein plaintiffs' motion to vacate on this ground does not constitute an abuse of discretion.[13]

## IV

■ The Epstein plaintiffs next contend that class counsel procured the Settlement in the Court of Chancery through misrepresentation and fraud. Specifically, the Epstein plaintiffs assert that class counsel misrepresented and concealed material facts concerning the value of the federal claims, and thereby violated their obligation of candor toward the tribunal as well as their fiduciary duty to protect the interests of the class. Furthermore, the Epstein plaintiffs contend that the Court of Chancery applied an incorrect legal standard in ruling on their Rule 60(b)(3) motion alleging fraud.

■ A Rule 60(b) motion is a "discretionary matter which requires the Trial Judge to weigh the facts and circumstances of [the] case." *Bachtle v. Bachtle,* Del.Supr., 494 A.2d 1253, 1256 (1985). As noted above, the grant or denial of a Rule 60(b) motion is generally reviewed for an abuse of discretion. A claim that the trial court employed an incorrect legal standard, however, raises a question of law that this Court reviews *de novo. Cf. Ison v. E.I. duPont De Nemours & Co., Inc.,* Del.Supr., 729 A.2d 832, 847 (1999) (reviewing *de novo* a claim that the court applied the incorrect legal standard in ruling on a motion to dismiss).

A motion under Rule 60(b)(3) may be granted where it is demonstrated that there was fraud, misrepresentation or other misconduct on the part of an adverse party. Ch.Ct.R. 60(b)(3). The Chancellor found that there was no evidence to support the accusation that class counsel duped the Vice Chancellor into signing the final judgment or order without understanding it or reading it. Reviewing the claim of fraud and misrepresentation, the Chancellor stated that "no evidence whatsoever supports it, let alone evidence capable of meeting the high Rule 60(b) standard, which requires 'the most egregious conduct involving a corruption of the judicial process itself.'" *See id.* at 280 (citing Wright & Miller, § 2870, at 418–19 (1995) (citation omitted)).

---

**13.** A conclusion by this Court that the Chancellor did not abuse his discretion in determining that the Epstein plaintiffs were not entitled to vacate the Judgment as void would obviate the need to address the argument that the adequacy issue is settled by the law of the case.

■ A Rule 60(b)(3) motion is reserved for situations where a party has engaged in fraud or misrepresentation that prevents the moving party from fairly and adequately presenting his or her case. *See* Wright & Miller, § 2860. The Epstein plaintiffs do not claim that the alleged fraud on the part of class counsel prevented them from adequately presenting their case.[14] Rather, the Epstein plaintiffs' contention is based on a theory that class counsel committed a fraud upon the court. Rule 60(b) states that it does not limit "the power of a Court ... to set aside a judgment for fraud upon the Court." The Epstein plaintiffs' claim is more properly characterized as a motion pursuant to Rule 60(b) that the judgment of the Vice Chancellor should be set aside because there was a fraud upon the court, rather than a motion under Rule 60(b)(3).[15] So characterized, the Chancellor applied the appropriate standard in ruling on the Epstein's plaintiffs' motion. Therefore, this Court's determination is limited to an inquiry into whether the Chancellor abused his discretion.

■ The Epstein plaintiffs contend that class counsel, at the Settlement hearing, fraudulently procured the Vice Chancellor's approval of the Settlement by: (i) duping the Vice Chancellor into signing the Amended Order, which contained a statement relating to the adequacy of representation; (ii) misrepresenting the merits of the federal claims; (iii) stating that it was unlikely that the Ninth Circuit would find a private right of standing to enforce SEC Rules 10b–13 and 14d–10; (iv) disparaging the viability of the Wasserman claim; (v) neglecting to mention the Sheinberg claim; and (vi) arguing that damages

resulting from the Wasserman claim were highly questionable.

■ A party seeking to vacate an order on the ground that his or her opponent effectuated a fraud on the court bears a heavy burden. As the Chancellor pointed out, to establish such a claim requires a showing of "the most egregious conduct involving a corruption of the judicial process itself." *See* Wright & Miller, § 2870. The claims put forth by the Epstein plaintiffs do not rise to this level of fraud. It has been recognized that there is an inherent conflict when class counsel seeks to settle claims on behalf of a class whose claims have been asserted globally in different jurisdictions on different grounds. Some of those claims are not as meritorious as others but a global settlement must, of necessity, embrace them all. Class counsel stands to collect a sizable fee from the settlement award and is thus eager to extend the reach of the settlement as far as possible. Courts have recognized the problem inherent in this situation and have established standards to prevent class counsel from selling out the class merely to collect that fee. *See Prezant; Goodrich v. E.F. Hutton Group, Inc.*, Del.Supr., 681 A.2d 1039, 1045 (1996).

■ While class counsel in this case may have been trying to downplay the potential value of the federal claims in order to achieve a settlement, the record does not reflect that his conduct at the Settlement hearing rises to the level of perpetuating a fraud upon the court. It is true that the Amended Order contained a provision regarding the adequacy of the class representative. The Vice Chancellor, an experienced jurist with extensive famil-

---

14. The Epstein plaintiffs, as members of the class, received notice of the proposed settlement but declined to participate as objectors or, as noted above, to simply opt out.

15. Rule 60(b)(3) is generally employed in situations where fraud or misrepresentation between the parties has occurred. *See* Wright & Miller, § 2870.

iarity with the intricacies of class and derivative settlements, however, was free to reject that provision prior to signing it. There is certainly no evidence that the provision was added after the Vice Chancellor's signature was obtained, conduct that clearly would rise to the level of fraud on the court. Nor does the record suggest that class counsel made affirmative misrepresentations to the court in an attempt to induce the Vice Chancellor to approve the Settlement. The Vice Chancellor was free to independently review the merits of the federal claims. Moreover, the record reflects that class counsel merely attempted to advance his position that the federal claims were of questionable value, stating for instance that it was "unlikely that the Ninth Circuit" would find a private right of standing to enforce the SEC Rules at issue. Reasonable minds may differ as to how a court is likely to rule on a given issue, but advocating a tenuous position does not amount to a fraud on the court.

As the Chancellor found, the record does not reflect that class counsel engaged in any conduct constituting a corruption of the judicial process. While class counsel may have been advocating that the federal claims were of marginal value, whether that is true or not, there is no evidence that class counsel committed a fraud upon the court. The Chancellor did not abuse his discretion in denying the motion to vacate.

For the foregoing reasons, we AFFIRM the decision of the Court of Chancery.