**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ACELA INVESTMENTS LLC, ACELA FIRST INVESTMENTS LLC, ACELA NEW INVESTMENTS LLC, and DR. STEFAN AIGNER, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2018-0558-AGB |
| RAYMOND DIFALCO and MANISH SHAH, | ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| INSPIRION DELIVERY SCIENCES, LLC and INSPIRION DELIVERY TECHNOLOGIES, LLC, | ) ) ) ) ) | |
| Nominal Defendants. | ) | |
| RAYMOND DIFALCO, | ) ) | |
| Counterclaim and Third-Party Plaintiff, | ) ) ) ) | |
| v. | ) ) | |
| DR. STEFAN AIGNER, | ) ) | |
| Counterclaim Defendant, | ) ) ) | |
| and | ) ) | |
| INSPIRION DELIVERY SCIENCES, LLC, | ) ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 20, 2020
Date Decided: April 27, 2020

Peter B. Ladig and Brett M. McCartney, BAYARD, P.A., Wilmington, Delaware; *Attorneys for Acela Investments LLC, Acela First Investments LLC, Acela New Investments LLC, and Dr. Stefan Aigner.*

Carmella P. Keener, COOCH AND TAYLOR, P.A., Wilmington, Delaware; William T. Reid IV, Michael Yoder, Jordan L. Vimont, and Ryan M. Goldstein, REID COLLINS & TSAI LLP, Austin, Texas; *Attorneys for Raymond DiFalco and Manish Shah.*

Donna L. Culver, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorney for Liquidating Trustee Derek C. Abbott.*

**BOUCHARD, C.**

In May 2019, the court appointed a liquidating trustee to wind up the affairs of Inspirion Delivery Services, LLC ("IDS" or the "Company"). On April 3, 2020, after hiring advisors and conducting a lengthy sale process, the liquidating trustee filed a motion requesting court approval to sell substantially all of the Company's assets to OHEMO LIFE SCIENCES INC. ("OHEMO"). Two of IDS's principals who made a last minute bid to acquire the assets themselves objected to the motion. For the reasons explained herein, the court grants the liquidating trustee's motion.

## I. BACKGROUND

The factual background and procedural history of this litigation is discussed in detail in this court's post-trial memorandum opinion dated May 17, 2019 ("Opinion").[1] The court recites below only those facts directly relevant to the court's consideration of the liquidating trustee's motion for entry of an order approving the sale of substantially all of the Company's assets to OHEMO pursuant to an asset purchase agreement dated March 31, 2020 (the "OHEMO Agreement").

### A. The Players

IDS is a Delaware limited liability company that develops abuse-deterrent pharmaceutical products.[2] It was formed as the successor to an entity called Inspirion Delivery Technologies, LLC ("IDT"), which was co-founded by Stefan

---

[1] *Acela Invs. LLC v. DiFalco*, 2019 WL 2158063 (Del. Ch. May 17, 2019).

[2] *Id.* at *2.

1

Aigner, Raymond DiFalco, and Manish Shah.[3]  IDS owns the technology for two FDA-approved abuse-deterrent opioids:  MorphaBond and RoxyBond.[4]

Most of the funds that paid for the development of MorphaBond and RoxyBond came from the predecessor of Trygg IDT I Holdings Corporation ("Trygg"), a joint venture between private equity firm Lindsay Goldberg LLC and Norwegian industrial development company Aker AS.[5]  Trygg and its predecessor invested over $45 million in IDT, and Trygg is currently a major investor in IDS.[6]

## B.    The Sale Order

IDS's LLC agreement contains a bespoke governance structure that failed to resolve deadlocks that developed between, on the one hand, Aigner, and on the other hand, DiFalco and Shah, who were aligned with each other.[7]  That governance structure included the presence of an "independent representative" named Hafid Touam.[8]  For the reasons detailed at length in the Opinion, the court concluded that it was not reasonably practicable to carry on the business of IDS in conformity with its LLC agreement, that judicial dissolution of the Company was warranted under

---

[3] *Id.*

[4] *Id.* at *4.

[5] *Id.* at *2.

[6] *Id.* at *4-5.

[7] *Id.* at *1-2.

[8] *Id.* at *6-7.

6 *Del. C.* § 18-802, and that the court would appoint a liquidating trustee under 6 *Del. C.* § 18-803 to wind up the Company's affairs.

On May 24, 2019, the parties jointly proposed that the court appoint Derek C. Abbott, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, to serve as the liquidating trustee (the "Liquidating Trustee).[9] On May 31, 2019, the court entered an order appointing Abbott as the Liquidating Trustee (the "Sale Order").[10]

The Sale Order provides that "the Liquidating Trustee shall have full control and dominion over the dissolution and liquidation of IDS."[11] It also spells out that, subject to obtaining court approval, the Liquidating Trustee was authorized to dispose of the assets of IDS in a transaction that could be structured in whatever form the Liquidated Trustee determined to be in the best interest of IDS, including selling the Company as a going concern or selling its assets (including its intellectual property and license rights) individually or collectively:

> [T]he Liquidating Trustee is authorized and empowered with the sole and exclusive authority to . . . to identify and marshal the assets of IDS and dispose of those assets in the manner the Liquidating Trustee determines is in the best interest of IDS and designed to maximize the value of IDS, including by creating and implementing a sales process for IDS's assets (including its intellectual property and rights under any license agreements), in such manner or form as the Liquidating Trustee decides in his or her sole discretion, whether selling IDS as a going concern, selling its assets individually or collectively, a merger

---

[9] Dkt. 144; Dkt. 146.

[10] Sale Order ¶ 1 (Dkt. 149).

[11] *Id.* ¶ 4.

3

transaction, membership unit purchase transaction, redemption, business combination, asset sale, auction, or any other transaction structure or form (which sale process shall be approved by the Court after application by the Liquidating Trustee).[12]

In July 2019, the Liquidating Trustee retained Locust Walk Partners LLC and Locust Walk Securities (together, "Locust Walk"), a life sciences investment banking firm, to advise him and to assist in conducting a sale process.[13] The founder and Chief Executive Officer of Locust Walk is Geoff Meyerson.[14]

The Liquidating Trustee subsequently filed a motion describing the steps of a proposed sale process that would target "firms active in the abuse-deterrent opioid space, firms active in the broader pain space, and global specialty pharmaceutical firms that have indicated an interest in expanding into the United States pharmaceutical market."[15] The proposed sale process contemplated receiving "best and final offers" by December 1, 2019, and entering into any "binding and definitive agreements by December 31, 2019."[16] The court entered an order approving the proposed sale process,[17] which was unopposed.[18]

---

[12] *Id.* ¶ 5.

[13] Abbott Decl. ¶ 8 (Dkt. 186); Meyerson Decl. ¶¶ 1-2 (Dkt. 188).

[14] Meyerson Decl. ¶ 1.

[15] Mot. for Approval of Process for Sale ¶ 8 (Dkt. 173).

[16] *Id.* ¶¶ 10-12.

[17] Dkt. 177.

[18] Dkt. 176.

## C. Daiichi Terminates its Licensing and Supply Agreement

On September 4, 2019, Daiichi Sankyo, Inc. ("Daiichi") terminated its licensing and supply agreement with IDS (the "Daiichi Agreement").[19] Under that agreement, which had been in place since October 2016, Daichii (i) agreed to commercialize MorphaBond and co-promote MorphaBond and RoxyBond and (ii) was obligated to "make royalty and milestone payments to IDS."[20]

Termination of the Daiichi Agreement, which became effective on March 4, 2020,[21] resulted in a critical loss of revenues for the Company. For the first half of 2018, the Company's *sole* revenues consisted of approximately $2.9 million in payments from Daiichi while its expenses were approximately $7.4 million.[22] As of trial, in December 2018, IDS expected to have negative cash flow of approximately $6 million for all of 2018 and a cash balance of approximately $4.1 million by the fourth quarter of 2019, assuming the Daiichi Agreement remained in place.[23]

---

[19] Abbott Supp. Decl. ¶ 3 (Dkt. 204).

[20] *Acela*, 2019 WL 2158063, at *8.

[21] Mot. for Order Approving Sale Hr'g Tr. (April 20, 2020) ("Tr.") 12-13; *see also Acela*, 2019 WL 2158063, at *8 n.90.

[22] *Acela*, 2019 WL 2158063, at *15 n.187.

[23] *Id.* at *15.

### D. IDS Enters an Interim Supply Agreement with Cerovene

On September 12, 2019, IDS entered into an interim supply agreement with Cerovene, Inc. ("Cerovene") pursuant to which Cerovene agreed to provide an ongoing supply of MorphaBond to IDS (the "Cerovene Supply Agreement").[24] Cerovene, which is co-owned by DiFalco and Shah, previously served as a development partner for MorphaBond and RoxyBond.[25]

On December 6, 2019, Cerovene sent the Company a notice of breach under the Cerovene Supply Agreement for failure to pay invoices that were "due and owing."[26] On March 12, 2020, Cerovene terminated the agreement.[27] According to Cerovene, IDS owes it at least $1.86 million for batches of MorphaBond it made, certain fixed fee commitments, and third-party costs and expenses.[28]

### E. The Sale Process Conducted by Locust Walk

In October 2019, Locust Walk sent a "teaser" to "approximately eighty-one entities that might be potential acquirers" of IDS, which included both financial and strategic prospective buyers.[29] The teaser described the Company and its business

---

[24] DiFalco Decl. ¶ 9 (Dkt. 196); *see* Saia Decl. Ex. 2 (Dkt. 195).

[25] *Acela*, 2019 WL 2158063, *2.

[26] Saia Decl. Ex. 7.

[27] *Id.*; Saia Decl. ¶ 17; DiFalco Decl. ¶ 11.

[28] DiFalco Decl. ¶ 12; Saia Decl. ¶ 17.

[29] Meyerson Decl. ¶ 4.

6

and stated that "multiple structures" for a transaction were being explored: "IDS is currently seeking a strategic partnership / acquisition (exploring multiple structures) for the ongoing commercialization of MorphaBond . . . and RoxyBond."[30]

During the following weeks, Locust Walk initiated calls with and sent process letters to eleven prospective acquirers who expressed an interest in acquiring IDS.[31] The process letters solicited non-binding indications of interests on or before December 1, 2019, which were to include, among other things, the bidder's desired transaction structure.[32] Locust Walk ultimately received non-binding indications of interest from five parties, each of which executed confidentiality agreements that allowed them to access IDS's data room and to participate in diligence calls with Locust Walk and members of IDS's senior management.[33]

During the sale process, the Liquidating Trustee met numerous times with key stakeholders of the Company and held weekly status update calls to which they were invited.[34] These stakeholders included Aigner, DiFalco, Shah, Trygg, and/or their representatives.[35] The Liquidating Trustee offered each of these stakeholders "the

---

[30] Meyerson Supp. Decl. ¶ 2 (Dkt. 205); *id.* Ex. A, at 2.

[31] Meyerson Supp. Decl. ¶ 3.

[32] *Id.* ¶¶ 3-4.

[33] Meyerson Decl. ¶ 6; Meyerson Supp. Decl. ¶ 4.

[34] Abbott Decl. ¶ 11.

[35] *Id.*

opportunity to execute confidentiality agreements allowing them to receive confidential information identifying those entities invited to participate in the process and the identities of those parties that submitted indications of interest and the terms thereof."[36] Cerovene and its counsel were invited to participate in those calls but they "rarely attended" and "declined to execute the confidentiality agreements to enable them to receive information regarding the identity of the bidders."[37]

Although the sale process overseen by Locust Walk generated five indications of interest, the Liquidating Trustee was unable to reach definitive terms for a transaction with anyone before the contemplated December 31, 2019 deadline.

## F.    The Liquidating Trustee Secures a Bid from OHEMO

The Liquidating Trustee continued his efforts to pursue a transaction in 2020. He realized during this period that the only parties who were meaningfully interested in pursuing a transaction were the stakeholders that had previously invested in IDS, *i.e.*, Trygg, Cerovene and its principals (DiFalco and Shah), Aigner and Touam and, through them, Galephar Pharmaceutical Research, Inc. ("Galephar").[38]

---

[36] Abbott Supp. Decl. ¶ 5.

[37] *Id.*

[38] Abbott Decl. ¶ 11; *Acela*, 2019 WL 2158063, *10.

During March 2020, the Liquidating Trustee or his advisors urged each of the stakeholders "weekly if not daily to make a concrete bid as quickly as possible, as IDS's resources were being depleted with no systematic and regular source of further revenue."[39] The Liquidating Trustee explained to each of them that "following execution of an acceptable bid and receipt of a deposit, [he] would shop that bid to the others for forty-eight hours and then seek this Court's approval of such bid."[40]

On March 2, 2020, William Reid, counsel for DiFalco and Shah,[41] requested that the Liquidating Trustee send him a confidential disclosure agreement for "a potential purchase of IDS' assets."[42] On March 27, at which point the Liquidating Trustee was "very close" to entering into an agreement with OHEMO, DiFalco sent an email to the Liquidating Trustee requesting access to IDS's data room for the purpose of "partaking in a possible purchase of IDS."[43] That same day, the Liquidating Trustee advised DiFalco that he was "very, very late to the process" and that the Liquidating Trustee "expected to sign a deal as early as the following

---

[39] Abbott Decl. ¶ 11.

[40] *Id.*

[41] Reid Decl. ¶ 3 (Dkt. 195).

[42] Abbott Supp. Decl. ¶ 6; *id.* Ex. A.

[43] Abbott Supp. Decl. ¶ 7; *id.* Ex. B.

9

Monday [*i.e.*, March 30] against which [DiFalco] would have an opportunity to bid."[44]

On Saturday, March 28, Reid sent the Liquidating Trustee a text message advising that his clients intended to "put in a bid this week for IDS" and inquired whether there was a deadline.[45] The Liquidating Trustee responded that he intended to "sign up the first acceptable deal and then shop it to others for 48 hours," after which he would file a motion seeking court approval.[46] Reid replied, "[l]et's talk after you circulate the 'acceptable deal.'"[47]

On March 31, 2020, IDS entered into the OHEMO Agreement, with the Liquidating Trustee signing on behalf of IDS, and received a $750,000 deposit from OHEMO.[48] OHEMO's president, Arthur Deboeck, is the principal of Galephar,[49] a pharmaceutical company based in Puerto Rico that Aigner tried to use as a

---

[44] Abbott Supp. Decl. ¶ 7; *id.* Ex. B.

[45] Abbott Supp. Decl. ¶ 8; *id.* Ex. C.

[46] Abbott Supp. Decl. Ex. C.

[47] *Id.*

[48] Abbott Decl. ¶¶ 12, 14; *see* Mot. for Order Approving Sale ("Mot."), Ex. A ("OHEMO Agreement") (Dkt. 185).

[49] DiFalco Decl. ¶ 15.

commercial manufacturer for IDS in the past.[50] Aigner and Touam were the principal representatives that negotiated on behalf of OHEMO.[51]

Under the OHEMO Agreement, OHEMO agreed to purchase substantially all of IDS' intellectual property and other business assets for an upfront payment of $4 million in cash and royalties payments to IDS equal to 10% of the net sales of RoxyBond through the earlier of (i) the last valid patent claim covering RoxyBond or (ii) until such time as IDS has received $10 million of royalty payments.[52]

Section 7.1(e) of the OHEMO Agreement provides that OHEMO may terminate the agreement if IDS has not filed for court approval of the transactions specified therein by 6 p.m. on the third business after OHEMO makes a deposit in the amount of $750,000 with an escrow agent, *i.e.*, April 3.[53] This provision created the 48-hour window for the Liquidating Trustee to attempt to secure a topping bid. Section 2.7 provides that IDS "shall not accept a competing bid from another party, if such other party is not similarly obligated to make a deposit with the Escrow Agent of at least [$750,000] on the date of execution of such party's purchase agreement."[54]

---

[50] *Acela*, 2019 WL 2158063, at *10, *25.

[51] Abbott Decl. ¶ 12. According to OHEMO's counsel, Aigner is not an officer or stockholder of OHEMO but he served as a consultant to OHEMO. Tr. 61.

[52] Abbott Decl. ¶¶ 12-13; OHEMO Agreement §§ 1.1 (definition of "Royalty Product"), 2.1, 2.5(a), 2.5(b).

[53] OHEMO Agreement § 7.1(e).

[54] *Id.* § 2.7.

11

## G. Cerovene Seeks to Make a Topping Bid

At 5:54 p.m. on March 31, 2020, the Liquidating Trustee sent an executed copy of the OHEMO Agreement to DiFalco and Reid via email with a note encouraging them "to bid against it."[55] The Liquidating Trustee sent a similar email that evening to Trygg, "which had also expressed an interest in bidding for IDS's assets."[56]

At 6:58 p.m. on March 31, Locust Walk also sent a copy of the OHEMO Agreement to DiFalco via email along with instructions for submitting a topping bid:

> Interested parties must: (1) submit a signed APA that represents a higher and better offer, as interpreted by the Liquidating Trustee, to the company; and (2) transfer the greater of $750K or 10% of the bid deposit to an Inspirion-designated escrow account by close of business on Thursday, April 2nd.[57]

Within hours after the OHEMO Agreement was executed, Locust Walk also contacted the eighty-one potential acquirers it solicited at the outset of the sale process, offering them a final opportunity to submit a superior bid in accordance with the terms quoted above.[58]

---

[55] Reid Decl. Ex. 1.

[56] Abbott Supp. Decl. ¶ 9.

[57] Meyerson Supp. Decl. ¶ 6; *id.* Ex. D.

[58] Meyerson Supp. Decl. ¶ 6.

At 3:59 p.m. on April 2, Michael Yoder, counsel for DiFalco and Shah,[59] sent an email to the Liquidating Trustee stating that "we should be getting you a signed APA from Cerovene later today."[60] At 4:55 p.m. on April 2, Yoder sent the Liquidating Trustee via email a copy of an asset purchase agreement between IDS and Cerovene (the "Cerovene APA") and a redline comparing it to the OHEMO Agreement.[61] Yoder's cover email stated that the changes between the OHEMO Agreement and the Cerovene APA "were fairly minor" and requested wire transfer instructions for the escrow deposit.[62] Yoder's cover email also stated that the attached agreement was "signed," but it was not.[63] Cerovene did not send the required wire transfer to the escrow agent at any time on April 2.

The Cerovene APA states that Cerovene would deliver at closing $4.1 million, but $1.85 million of that amount would come in the form of a credit bid to discharge the debt IDS owes Cerovene under the Cerovene Supply Agreement.[64] The Cerovene APA contains the same royalty provision as the OHEMO Agreement except that the royalty cap was increased from $10 million to $15 million.[65]

---

[59] Yoder Decl. ¶ 3 (Dkt. 195).

[60] *Id.* ¶ 6; *id.* Ex. 2.

[61] Yoder Decl. ¶ 6; *id.* Ex. 3 at 2 ("Cerovene APA").

[62] Yoder Decl. Ex. 3 at 1.

[63] Yoder Decl. ¶ 6; *see* Cerovene APA.

[64] Cerovene APA §§ 2.5(a), 2.5(b).

[65] *Compare* Cerovene APA § 2.5(c) *with* OHEMO Agreement § 2.5(b).

At 7:37 a.m. on April 3, a representative of Locust Walk sent Yoder an email stating that IDS would not evaluate Cerovene's offer for the following reasons:

- Cerovene failed to post the deposit by the stated deadline of end of business on Thursday, April 2nd

- Cerovene failed to provide proof of financial wherewithal, and Cerovene has claimed near insolvency status the whole case

- The bid was not higher and better, and assignment involved an unspecified entity

- The lack of a deposit and executed APA entails higher closing risk.[66]

Later on April 3, Yoder forwarded to the Liquidating Trustee an email Shah sent to Yoder at 3:16 p.m. on April 2, to which was attached a signature page for the Cerovene APA that Shah had signed on April 2 on behalf of Cerovene.[67] Yoder noted in his forwarding email that he "just realized that this did not come through in [his] transmission yesterday for some reason."[68] At 3:34 p.m. on April 3, Reid sent the Liquidating Trustee an email with a confirmation that Cerovene had sent $2.3 million to his firm's trust account on April 3 "to be used to back up [his clients'] bid."[69] The letter asked the Liquidating Trustee to hold a telephonic auction.[70]

---

[66] Yoder Decl. Ex. 4.

[67] Yoder Decl. ¶ 8; *see id.* Ex. 5.

[68] Yoder Decl. Ex. 5.

[69] Reid Decl. ¶ 6; *id.* Ex. 2.

[70] Reid Decl. Ex. 2.

On April 3, 2020, the Liquidating Trustee filed a motion seeking court approval of the OHEMO Agreement,[71] to which DiFalco and Shah objected on April 13.[72]

## II.   ANALYSIS

DiFalco and Shah (together, "Objectors") assert two objections to the proposed sale of the Company to OHEMO.  Specifically, Objectors contend that (i) the Liquidating Trustee's rejection of their bid for failing to comply with the bidding requirements was unwarranted and (ii) Cerovene's offer provides more value to IDS's stakeholders than the OHEMO Agreement.[73]  Before turning to the objections, the court will address the important threshold issue of what standard of review applies to its consideration of the two objections.

### A.   Standard of Review

The Sale Order, which was proposed jointly by the parties in this litigation, expressly provides that "[a]ll actions taken by the Liquidating Trustee pursuant to this Order . . . shall be presumed to be taken on an informed basis, in good faith, and in the honest belief that such actions taken were in the best interests of IDS," and that "[a]ny actions by the Liquidating Trustee may be challenged in this Court, but

---

[71] Mot.

[72] Obj. (Dkt. 195).

[73] *Id.* ¶¶ 5-6.

15

shall be subject to reversal only after a finding by the Court that the Liquidating Trustee abused his discretion."[74] This court has adopted an abuse of discretion standard in similar orders involving the court-ordered sale of an entity.[75]

At oral argument, Objectors argued that the Liquidating Trustee's motion should be subject to plenary review.[76] Objectors did not make this argument in their opposition and thus waived the issue.[77] In any event, applying a plenary review standard would contravene the plain language of the Sale Order and make no sense.

The Sale Order provides that "*[a]ny actions* by the Liquidating Trustee . . . shall be subject to reversal only after a finding by the Court that the Liquidating Trustee abused his discretion."[78] Such actions would include the Liquidating Trustee's decision to enter into the OHEMO Agreement and to reject the Cerovene APA, as well as his valuation of the two bids.

---

[74] Sale Order ¶ 8.

[75] *See, e.g.*, *In re TransPerfect Global, Inc.*, 2018 WL 904160, at *14-16 (Del. Ch. Feb. 15, 2018) (applying abuse of discretion standard for court-ordered sale of a corporation), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694 (Del. 2018) (TABLE); *In re Supreme Oil Co., Inc.*, 2015 WL 2455952, at *6 (Del. Ch. May 22, 2015) (abuse of discretion standard for interim decisions); *In re Carlisle Etcetera LLC*, 2015 WL 10371435, at *3 (Del. Ch. May 4, 2015) (same).

[76] Tr. 27.

[77] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) (issues not briefed are deemed waived).

[78] Sale Order ¶ 8 (emphasis added).

16

It also would make little sense for the court to casually disregard the Liquidating Trustee's decisions and recommendations. The parties mutually selected the Liquidating Trustee, who serves as an agent of the court.[79] He is indisputably independent and has no personal financial interest in the outcome of the sale process. He also possesses invaluable knowledge and insight gained over the past ten months of his tenure as Liquidating Trustee concerning, among other things, the Company's operations and finances as well as the capabilities of its stakeholders. It is for such reasons that this court routinely applies a deferential standard of review when the action of an agent of the court is challenged and, here, the agreed-upon standard of review in the Sale Order is abuse of discretion.

Our Supreme Court has explained that a decision will not be overturned as an abuse of discretion if the decision "was based upon conscience and reason, as opposed to capriciousness or arbitrariness."[80] Stated differently, a court will overturn a decision for abuse of discretion only if it was "arbitrary or capricious"[81]

---

[79] *See* 6 *Del. C.* § 18-803(a) ("the Court of Chancery, upon cause shown, may wind up the limited liability company's affairs upon application of any member or manager . . . and in connection therewith, may appoint a liquidating trustee.").

[80] *Chavin v. Cope*, 243 A.2d 694, 695 (Del. 1968).

[81] *Lankford v. Lankford*, 157 A.3d 1235, 1241 (Del. 2017) (citing *Wright v. Wright*, 49 A.3d 1147, 1150 (Del. 2012)).

or "exceeds the bounds of reason in light of the circumstances."[82]   This is the standard the court will apply in reviewing Objectors' two objections.

### B. The Liquidating Trustee Did Not Abuse His Discretion in Rejecting the Cerovene Bid for Failing to Comply with the Bidding Requirements

DiFalco and Shah's first objection challenges the Liquidating Trustee's decision to reject the bid Cerovene submitted on April 2 for failing to comply with the requirements for submitting a topping bid.

It is undisputed that (i) DiFalco and Shah knew before OHEMO finalized its bid that there would be a 48-hour deadline for submitting a topping bid and (ii) Cerovene failed to comply with two of the requirements for submitting a topping bid, *i.e.*, providing an *executed* agreement and a deposit of at least $750,000 *before* the deadline.  Objectors nonetheless contend that it was "unreasonable" for the Liquidating Trustee to insist on compliance with these requirements given that, the day *after* the deadline, Cerovene (i) sent $2.3 million to its counsel's trust account in an effort to satisfy the deposit requirement and (ii) provided a copy of the signature page for the Cerovene APA that Shah had signed on April 2, but which was not sent to the Liquidating Trustee on that date.[83]  The court disagrees.

---

[82] *Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009) (citing *In re MCA, Inc., S'holder Litig.*, 785 A.2d 625, 633-34 (Del. 2001)).

[83] Obj. ¶ 14.

As an initial matter, it is mystifying that Cerovene waited until literally the last few minutes of a six-month process before submitting a bid. DiFalco and Shah rationalize this delay based on their purported belief that the Liquidating Trustee was intent on selling the Company as a going concern, which did not interest them.[84] But this belief is directly contradicted by the plain language of the Sale Order, which expressly authorized the Liquidating Trustee to sell IDS's assets (including its intellectual property and license rights) individually or in whatever form he believed would maximize IDS's value.[85] If DiFalco and Shah believed that the Company's intellectual property was, as they say, the "prize,"[86] they were free to bid to acquire that intellectual property at any time.

The reality is that DiFalco and Shah chose to disengage from the sale process. They rarely attended the Liquidating Trustee's weekly meetings and declined to enter a confidentiality agreement to learn important details about the sale process that Locust Walk was conducting. And whatever may have caused their inaction before March 2020, DiFalco and Shah had no excuse for not getting in the game that month—or at least getting their ducks in a row—when the Liquidating Trustee urged them and the other stakeholders to make a "concrete bid as quickly as possible" and

---

[84] *Id.* ¶ 8.

[85] *See supra* Part I.B.

[86] Obj. ¶ 14.

put them on notice that they would have 48 hours to submit a topping bid after "execution of an acceptable bid and receipt of a deposit."[87]

Under the OHEMO Agreement, OHEMO had the right to walk away from the transaction it proposed if the Liquidating Trustee did not seek court approval of that transaction within three business days (*i.e.*, by April 3), and the Liquidating Trustee could only accept a competing bid that was accompanied by a deposit of at least $750,000 on the date of execution of a competing purchase agreement.[88] DiFalco and Shah disparage these requirements as "arbitrary technicalities,"[89] but the record suggests otherwise.

Both the Liquidating Trustee and Meyerson attest that the bid requirements in the OHEMO Agreement "were heavily negotiated and formed a material part of" the transaction.[90] This evidence is highly credible given that the Company had been engaged in a sale process for six months that failed to yield any bidders and that its financial condition was deteriorating,[91] particularly with the loss of revenues from Daiichi after it terminated its contract with the Company.[92] Whoever would step

---

[87] Abbot Decl. ¶ 11.

[88] *See supra* Part I.F.

[89] Obj. ¶ 14.

[90] Abbott Supp. Decl. ¶ 10; *see also* Meyerson Decl. ¶ 5.

[91] Abbott Decl. ¶ 11 (noting that "IDS's resources were being depleted with no systematic and regular source of further revenue").

[92] *See supra* Part I.C.

forward to make a bid at this point logically would have substantial leverage to demand tight restrictions on having its bid shopped. It thus was not arbitrary or capricious for the Liquidating Trustee to agree to the topping bid limitations in the OHEMO Agreement in order to secure a binding offer from OHEMO under the dire circumstances facing the Company at that time.[93]

Nor did the Liquidating Trustee abuse his discretion when he refused to disregard the negotiated-for bidding requirements in the OHEMO Agreement in order to consider Cerovene's bid.[94] With respect to Cerovene's failure to post the deposit, the Liquidating Trustee was particularly concerned because Cerovene "repeatedly stated that it lacks the funds necessary to continue operating its business."[95] Locust Walk, furthermore, specifically advised the Liquidating Trustee not to extend the 48-hour deadline because of the risk of losing the OHEMO transaction:

> Having failed to receive a qualifying bid prior to the expiration of the deadline, Locust Walk advised the Liquidating Trustee it was inadvisable to extend the deadline for submission of a qualifying bid

---

[93] The OHEMO Agreement does not contain a termination fee. Thus, although the timeframe for submitting a topping bid was tight, acceptance of a topping bid would not have required the Company to pay a breakup fee.

[94] After receiving Cerovene's bid, and again after receiving DiFalco and Shah's objection, the Liquidating Trustee (directly and through counsel) sought OHEMO's consent to enable him to conduct a telephonic auction of IDS's assets in order to avoid a contested hearing, but OHEMO declined, "citing Cerovene's failure to submit a qualifying higher and better bid." Abbott Supp. Decl. ¶ 12

[95] *Id*. ¶ 11.

21

from Cerovene due to the material risk of losing the OHEMO transaction for failure to abide by the terms of the APA, with no guarantee that the [Liquidating] Trustee would, in fact, receive a binding superior offer from Cerovene.[96]

Based on this advice and his own consideration of the matter, the Liquidating Trustee concluded he could not consider "Cerovene's non-qualifying bid" without putting OHEMO's binding offer at risk.[97] This decision to protect the proverbial "bird in hand" was not arbitrary or capricious in my view.[98]

### C. The Liquidating Trustee Did Not Abuse His Discretion in Determining that OHEMO's Bid is the Better Offer

DiFalco and Shah's second objection challenges the Liquidating Trustee's determination that the OHEMO Agreement "represents the highest and best offer for IDS's assets."[99] There are two key differences between the terms of the OHEMO Agreement and the Cerovene APA that bear on the respective value of those proposals: (i) the nature and amount of the payment due at closing and (ii) the cap on potential future royalties.[100] The court will address each of these issues in turn.

---

[96] Meyerson Supp. Decl. ¶ 7.

[97] Abbott Supp. Decl. ¶ 10.

[98] The Objectors criticize the Liquidating Trustee and Locust Walk for not providing wire transfer instructions "when inviting the bid." Obj. ¶ 8. Although Objectors have a point, Cerovene's counsel just as easily could have requested this information after receiving the bidding instructions from Locust Walk on March 31, but they inexplicably failed to do so until five minutes before the deadline on April 2. *See* Abbott Supp. Decl. ¶ 9.

[99] Mot. ¶10.

[100] Objectors note that their bid also excludes "litigation claims" against Touam. Obj. ¶ 25. Objectors do not explain, however, the nature of any claims IDS might have against

22

### 1. Closing Payment

Under the OHEMO Agreement, OHEMO is obligated to pay IDS $4.0 million in cash at closing.[101] The Cerovene APA provides for a "closing payment" with a nominal value of $4.1 million consisting of two components: (i) $2.25 million in cash due at closing and (ii) a credit bid in the amount of $1.85 million to be used to discharge the debt IDS owes under the Cerovene Supply Agreement.[102]

The Liquidating Trustee contends that the credit bid component of Cerovene's proposal makes it "less attractive than OHEMO's all cash offer" "given IDS's current liquidity situation and the need to establish a reserve for potential claims and anticipated wind down costs."[103] Stated differently, in the Liquidating Trustee's opinion, the closing payment in Cerovene's proposal is worth less than $4 million in cash because the $1.85 million attributable to the credit bid "may not be paid in full depending upon IDS' cash position at closing after the establishment of a reserve

---

Touam, making it impossible to ascribe a value to the Company of this aspect of their proposal.

The Cerovene APA also expressly excludes certain equipment located at a Galephar facility. *Compare* Cerovene APA § 2.2(j) *with* OHEMO Agreement § 2.2(j). But this equipment, which the Liquidating Trustee contends only has "little salvage value," also is excluded (albeit not expressly) from the OHEMO Agreement. Abbott Decl. ¶ 17; Meyerson Supp. Decl. ¶ 11.

[101] OHEMO Agreement § 2.5(a).

[102] Cerovene APA §§ 2.5(a), 2.5(b).

[103] Liquidating Trustee's Reply ¶ 13 (Dkt. 203); Abbott Supp. Decl. ¶ 13; Meyerson Supp. Decl. ¶ 8.

23

and anticipated wind down costs."[104]  In my opinion, the Liquidating Trustee did not abuse his discretion in coming to this conclusion.

As of the time of trial, in December 2018, IDS was experiencing significant negative cash flows (approximately $6 million in 2018) and was entirely reliant on Daiichi for revenues.[105]  In September 2019, when Daiichi terminated the Daiichi Agreement, IDS's financial position became precarious as it lost the "source of liquidity" on which it had been "dependent."[106]  Two months later, in December 2019, IDS stopped paying Cerovene, which led to the termination of the Cerovene Supply Agreement in March 2020.[107]  Currently, IDS has less than $600,000 of cash on hand[108] and "does not have the financial wherewithal to continue marketing [its] assets for sale."[109]

Given these circumstances, and given the need to establish reserves to pursue claims (*e.g.*, against Daiichi) as well as to wind-up the Company after the closing of a transaction, it was reasonable in my view—and certainly was not an abuse of

---

[104] Meyerson Supp. Decl. ¶ 8.

[105] *See supra* Part I.C.

[106] Abbott Decl. ¶ 19; *see also* Tr. 50 (Objectors' counsel acknowledging that IDS was "financially distressed" at this time).

[107] Saia Decl. ¶ 17; *id.* Ex. 7.  Objectors apparently did not terminate the Cerovene Supply Agreement earlier as an accommodation to enable Locust Walk to market IDS with a supply agreement in place.  Obj. ¶ 8.

[108] Tr. 16.

[109] Abbott Decl. ¶ 18.

discretion—for the Liquidating Trustee to conclude that OHEMO's all-cash offer is superior by discounting the credit bid component of Cerovene's bid.[110]

## 2. Potential Royalties

The OHEMO Agreement and the Cerovene APA both provide for the payment of royalties to IDS equal to 10% of the net sales of RoxyBond through the earlier of (i) the last valid patent claim covering the product or (ii) until such time as IDS has received a certain level of royalty payments.[111] The only difference between the agreements is that royalty cap is $10 million in the OHEMO Agreement and $15 million in the Cerovene APA.[112]

Although the royalty caps in the two proposals differ by $5 million, determining and comparing the potential value of the royalty component in the two proposals is far more complicated than focusing on that difference. Indeed, valuing the royalty component of the two proposals is inherently speculative because both OHEMO and Cerovene have never manufactured RoxyBond on a commercial scale or tried to sell, much less actually sold, the product. Given both bidders' lack of a

---

[110] Objectors contend that "the net benefit to IDS's stakeholders of Cerovene forgiving $1.85 million in undisputed debt is the same as $1.85 million in cash" because "Section 18-804 of the LLC Act dictates that creditors be paid prior to equity." Obj. ¶ 24. This misses the point of the Liquidating Trustee's analysis, which is that the credit bid must be discounted because it is far from clear whether there will be sufficient proceeds for IDS to pay all of its creditors. *See* Tr. 57.

[111] OHEMO Agreement § 2.5(b); Cerovene APA § 2.5(c).

[112] *Compare* OHEMO Agreement § 2.5(b) *with* Cerovene APA § 2.5(c).

track record in commercializing RoxyBond, the Liquidating Trustee determined that "there is a very real possibility that no future royalty stream will be paid by either bidder," and "almost entirely discounted the value of those potential streams."[113]

Objectors "agree that [OHEMO's] promised royalties are worthless" but contend that "the probability of [Cerovene] successfully manufacturing RoxyBond . . . is far greater than zero."[114] More specifically, DiFalco and Shah argue that Cerovene is better positioned than OHEMO to generate royalties for IDS for essentially three reasons: (i) Cerovene's facility in Valley Cottage, New York "is already an FDA-approved facility for RoxyBond manufacture;" (ii) they "have demonstrated a track record in obtaining regulatory approval and manufacturing abuse-deterrent opioids, including RoxyBond;" and (iii) Deboeck, who is OHEMO's principal, "flopped in previously attempting to launch RoxyBond at Galephar" where "that effort . . involved significant data irregularities, possible product defects, and troubling questions regarding unaccounted-for opioid substances."[115]

With respect to Cerovene's past experience manufacturing RoxyBond, the trial record shows (and DiFalco's recent declaration confirms) that Cerovene's experience was limited to making *test batches* of RoxyBond during the new drug

---

[113] Abbott Decl. ¶18.

[114] Obj. ¶¶ 16, 22.

[115] *Id.* ¶¶ 18-20.

26

application process leading up to its receipt of FDA approval three years ago, in April 2017.[116] Shah confirmed at trial that Cerovene was not in a position to manufacture RoxyBond commercially.[117] DiFalco elaborated: "In RoxyBond's case, we're not making it, and we never said we were going to make it. It was never planned for us to make it."[118] And with respect to Galephar's past experience, the Liquidating Trustee points out that two other contract manufacturing organizations (Patheon N.V. and Catalent Pharma Solutions, LLC) also failed to commercialize RoxyBond "despite significant technology transfer assistance" from DiFalco.[119]

In examining Cerovene's bid, Locust Walk advised the Liquidating Trustee that Cerovene (i) "lacks a salesforce and supporting commercial infrastructure;" (ii) "lacks the working capital and capacity to produce both MorphaBond and Roxy[B]ond at a commercial scale;" and (iii) "has no prior experience leading efforts to commercialize opioids."[120] Based on his own "extensive interactions with Mr. DiFalco while negotiating for a continued supply of MorphaBond," the Liquidating Trustee also had "significant reservations regarding Cerovene's ability to act in a

---

[116] *Acela*, 2019 WL 2158063, at *4, *34; DiFalco Decl. ¶ 44 ("Mr. Shah and I, through Cerovene, oversaw the manufacture of the RoxyBond tablets used in obtaining the approved NDA for RoxyBond.").

[117] Trial Tr. 600 (Shah) (Dkt. 134).

[118] Trial Tr. 753 (DiFalco).

[119] Liquidating Trustee's Reply ¶ 16.

[120] *Id.* ¶¶ 14-15 (citing Meyerson Supp. Decl. ¶ 9).

27

commercially reasonable fashion so as to enable it to reach an agreement with a third party to successfully and commercialize and sell" RoxyBond.[121]

Significantly, as the Liquidating Trustee observed, "Cerovene's offer contained a provision that would have allowed it to assign the asset purchase agreement to an unidentified designee without the benefit of any understanding or information regarding that entity's financial wherewithal or ability to fulfill the financial and other obligations required of it under the terms of the asset purchase agreement."[122] Thus, irrespective of whatever conclusions one may reach about DiFalco and Shah's ability to commercialize RoxyBond successfully, the Cerovene APA carried the additional risk that those obligations would be assigned to another party whose ability to commercialize RoxyBond is completely unknown.

Locust Walk, an experienced life sciences investment banking firm,[123] concluded it had "no reason to believe that Cerovene will be able to commercialize" RoxyBond "so as to create any future downstream royalty payments to IDS," and that "OHEMO is more likely than Cerovene to be able to commercialize RoxyBond in the future."[124] Based on this advice, and for the other reasons explained above, the Liquidating Trustee did not "perceive the increased cap on future royalty

---

[121] *Id.* ¶ 16 (citing Abbott Supp. Decl. ¶ 14).

[122] Abbott Supp. Decl. ¶ 11; *see* Cerovene APA § 1.1 (definition of "Purchaser").

[123] *See* Meyerson Decl. ¶ 1.

[124] Meyerson Supp. Decl. ¶¶ 9-10.

payments from $10 million to $15 million to be a material improvement on the OHEMO [Agreement]."[125]

In accordance with the Sale Order, the conclusions the Liquidating Trustee reached in evaluating the royalty component of the OHEMO and Cerovene bids "shall be presumed to be taken on an informed basis, in good faith, and in the honest belief that such actions were in the best interests of IDS."[126] Given the Liquidating Trustee's good faith consideration of the factors summarized above, furthermore, it can hardly be said that the Liquidating Trustee was arbitrary or capricious, or exceeded the bounds of reason, in reaching those conclusions.

* * * * *

For the reasons explained above, no basis exists under the applicable standard of review for the court to second guess the Liquidating Trustee's determination that the OHEMO Agreement provides more value to IDS than the Cerovene APA.[127]

---

[125] Abbott Supp. Decl. ¶ 15.

[126] Sale Order ¶ 8.

[127] Notably, Trygg, a major stakeholder of IDS that followed the sale process closely, did not express to the court any disagreement with this determination. *See* Abbott Decl. ¶ 11.

## III. CONCLUSION

For the reasons explained above, the court grants the Liquidating Trustee's motion and approves the sale of substantially all of the Company's assets pursuant to the terms and conditions of the OHEMO Agreement.

**IT IS SO ORDERED.**